**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Kristen O'Connor (SBN 305113)
KristenO@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL TOLLEN, on behalf of himself and a class of similarly situated investors,<br><br>Plaintiff,<br><br>v.<br><br>GERON CORPORATION and JOHN A. SCARLETT<br><br>Defendants. | Case No.: 20-cv-547<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Michael Tollen ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Geron Corporation ("Geron" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; and (iii) analyst reports, media reports, and other publicly disclosed reports and information about the Company.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Geron common stock between March 19, 2018 and September 26, 2018, inclusive (the "Class Period"), who were damaged thereby (the "Class'). The claims asserted herein are alleged against Geron, the Company's President and Chief Executive Officer ("CEO") John A. Scarlett, and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

2.      Geron is a biopharmaceutical company. Throughout the Class Period, Defendants misled investors regarding a drug called imetelstat, which was intended to treat certain cancers that occur in bone marrow. Specifically, Defendants misled investors about the results of a clinical drug study of imetelstat called IMbark. That study was designed to ascertain whether imetelstat helped patients with a cancer called myelofibrosis.

3.      Geron was developing imetelstat in partnership with Janssen Biotech Inc. ("Janssen"), a division of Johnson & Johnson. During the Class Period, Janssen would decide whether to continue to partner with Geron on imetelstat. If Janssen decided to continue with the collaboration, it would owe Geron an upfront payment of $65 million, with hundreds of millions of dollars in additional milestone payments possible.

4.      Janssen would make its decision based in part on the results of the IMbark trial. Janssen was conducting that trial under the supervision of the Joint Steering Committee ("JSC")

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

consisting of both Geron and Janssen employees.  The JSC conducted an internal, nonpublic review of the IMbark results in March 2018.  That review showed that IMbark was a failure.

5.     The two primary endpoints for the study, the results which would determine whether the study was successful or not, were: (i) the spleen response rate, which measured the reduction in spleen swelling, and (ii) a composite of various symptoms called the Total Symptom Score (TSS).  In order for IMbark to succeed, patients in the study needed to show at least a 35% reduction in spleen volume and a minimum 50% reduction in TSS.

6.     The actual results of the IMbark study were a disappointing 10% for the spleen response rate and 32% reduction in TSS—not even close to the results required for success.  These poor results boded ill for both the future of imetelstat and for Geron's partnership with Janssen.

7.     When Geron held a conference call with investors on March 19, 2018, however, defendant Scarlett, Geron's President and CEO, chose to tout the median overall survival of patients in IMbark, one of the study's fourteen secondary endpoints.  Generally, a median value is that which separates the lower half and upper half of a data set.  In this context, it referred to the amount of time that elapsed before half of the patients in the study had passed away.  Scarlett announced that the median overall survival had not been reached after nineteen months, meaning that the final median would almost certainly be greater than nineteen months.  He further claimed that, in comparison, an analysis of "real world" data showed that patients with myelofibrosis who discontinued or no longer responded to their medication showed median overall survival of just seven months.

8.     Not surprisingly, Scarlett's encouraging statements about the IMbark study caused Geron's stock price to increase more than 28% in one trading day.

9.     While defendant Scarlett is free to tout "positive" information about IMbark, under the federal securities laws he is bound to do so in a manner that will not mislead investors.  This responsibility includes disclosing any additional adverse information that cuts against the voluntarily revealed, positive information.  In this case, there was no adverse information more significant than the actual results of the IMbark study, which were known to Defendants at the

2

1    time. **It was a failure**.  Moreover, Defendants knew, but failed to disclose, that the "real world"

2    survival data that Scarlett was touting was itself misleading due to the disease characteristics of

3    the patients in that study when compared to those in IMbark.

4          10.     A week later, on March 27, 2018, a biotech journalist published an article which

5    called out Scarlett and Geron for misleading the market with their statements on March 19, 2018,

6    and for failing to disclose IMbark's primary endpoint data or the baseline disease characteristics

7    of patients in the study, all of which would help investors evaluate Defendants' encouraging

8    claims.

9          11.     On this news, Geron shares, which had closed at $5.98 per share on March 26,

10    2018, dropped 29% over the next two days to close at $4.23 per share on March 28, 2018.

11          12.     This partial disclosure of Defendants' deception, however, did not fully reveal

12    the extent of the fraud with respect to IMbark.  Indeed, Defendants were undeterred and

13    continued to push the misleading increased survival rate narrative at a March 27, 2018

14    Healthcare Conference and in the Company's Q1 and Q2 Form 10-Qs filed on May 10, 2018

15    and July 31, 2018.  At the same time, they continued to hold back the results of the IMbark study

16    and other information which would have allowed investors to evaluate Defendants' positive spin

17    on the study's secondary results.

18          13.     As a result, the price of Geron common stock continued to trade at artificially

19    inflated levels.  Geron took advantage of the inflation that it created by selling more than

20    $83 million of its common stock to unsuspecting investors during the second quarter of 2018.

21          14.     On September 27, 2018, Defendants issued a press release finally admitting that

22    IMbark was a failure.  Geron disclosed that patients in the IMbark study had shown only

23    10% spleen volume reduction and 32% TSS reduction.  Not coincidentally, Defendants further

24    announced that Janssen had decided to terminate its partnership with Geron.

25          15.     In response to these belated disclosures, the price of Geron's stock plummeted

26    from $6.23 per share to $2.31 per share the next day, a decrease of over 62%.

27

28

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**JURISDICTION AND VENUE**

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by SEC, 17 C.F.R. § 240.10b-5.   Jurisdiction for this Court is conferred over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).   The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  In addition, Defendants reside and/or transact business in this District.  The Company maintains its corporate headquarters in this District.

18.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

**PARTIES**

19.     Plaintiff Michael Tollen purchased Geron common stock on the public market during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages as a result of the violations of the federal securities laws alleged herein.

20.     Defendant Geron is a biopharmaceutical company with its headquarters located in Menlo Park, California.  Geron's common stock is traded under the symbol GERN on the NASDAQ, which is an efficient market.   As of November 1, 2019, there were 199,777,619 shares of the Company's common stock outstanding.

21.     Defendant John A. Scarlett was, at all relevant times, President and CEO of the Company throughout the Class Period.

22.     During the Class Period, Defendant Scarlett ran the Company as a hands-on manager overseeing Geron's operations and finances and made the materially false and misleading statements described herein.  Defendant Scarlett had intimate knowledge about core aspects of Geron's financial and business operations.  He was also intimately involved in

4

1  deciding which disclosures would be made by Geron.  Because of his position and access to

2  material non-public information available to him, Defendant Scarlett knew that the adverse facts

3  specified herein had not been disclosed to, and were being concealed from, the public, and that

4  the positive representations which were being made were then materially false and/or

5  misleading.  Defendant Scarlett, because of his position with Geron, possessed the power and

6  authority to control the contents of the Company's reports to the SEC, press releases, and

7  presentations to securities analysts, money and portfolio managers, and institutional investors.

8  Defendant Scarlett was provided with copies of the Company's reports and press releases alleged

9  herein to be misleading prior to, or shortly after, their issuance and had the ability and

10  opportunity to prevent their issuance or cause them to be corrected.

11  **BACKGROUND**

12  23.  Imetelstat was Geron's sole product candidate.  The Company was developing

13  imetelstat with Janssen pursuant to a Collaboration and License Agreement ("CLA").  The CLA

14  became effective on December 15, 2014, upon which Geron received a $35 million upfront

15  payment from Janssen.

16  24.  Under the CLA, Janssen was granted the exclusive rights to develop and

17  commercialize imetelstat worldwide for all indications in oncology, including hematologic

18  myeloid malignancies, and all other human therapeutic uses.  Janssen was wholly responsible

19  for developing, manufacturing, seeking regulatory approval for, and commercialization of,

20  imetelstat.

21  25.  At the start of the Class Period, Janssen was conducting two clinical trials of

22  imetelstat: (i) IMbark, a Phase 2 trial in myelofibrosis (MF); and (ii) IMerge, a Phase 2/3 trial

23  in myelodysplastic syndrome (MDS).  Pursuant to the CLA, Geron contributed 50% of the

24  development costs for these trials.

25  26.  The IMbark trial for imetelstat, although conducted by Janssen, was supervised

26  by a Joint Steering Committee ("JSC"), which, pursuant to the CLA, was comprised of three

27  Geron employees and three Janssen employees.  The co-primary efficacy endpoints for the

28  IMbark trial were spleen response rate, defined as the proportion of patients who achieve a

5

greater than or equal to 35% reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a greater than or equal to 50% reduction in Total Symptom Score, at twenty-four weeks. The study also had fourteen secondary outcome measures, the fifth of which was overall survival.

27.     The first patient enrolled in IMbark in September of 2015 and the last enrolled in October of 2016. Because the final spleen volume reduction and symptom scores were measured after patients had been taking the drug for twenty-four weeks, the data regarding these endpoints was available by mid-2017. Nonetheless, the study was scheduled to continue until a set number of patients perished or April 2018, whichever came first.

28.     Under the CLA, if imetelstat failed to meet criteria determined by Janssen to support continuing, or for any other reason, Janssen could unilaterally discontinue the imetelstat program and terminate the CLA. Nevertheless, under the CLA, Janssen was required to undertake a primary analysis of the IMbark study and notify Geron whether it would: (i) maintain the license rights granted under the CLA and continue the development of imetelstat; or (ii) discontinue the development of imetelstat and terminate the CLA. Geron announced that it expected Janssen's decision by the end of the third quarter of 2018 (*i.e.*, September 30, 2018).

29.     According to the CLA, if Janssen decided to continue with the collaboration, it would owe Geron a milestone payment of $65 million, with hundreds of millions of dollars in additional milestone payments possible.

30.     On the other hand, if Janssen decided to terminate the collaboration agreement, Geron would face dire consequences. Geron warned investors of the following potential repercussions of such a decision, among others:

- we would no longer have the right to receive any milestone payments or royalties under the Collaboration Agreement;

- further development of imetelstat, if any, would be significantly delayed or terminated;

- we would bear all risks and costs related to any further clinical development, manufacturing, regulatory approval and commercialization of imetelstat, if any;

6

- we might determine that the commercial potential of imetelstat does not warrant further development of imetelstat by us, in which case the development of imetelstat would cease, which might cause us to cease operations;

- we would need to raise substantial additional capital if we were to choose to pursue imetelstat development on our own, or we would need to establish alternative collaborations with third parties, which might not be possible in a timely manner, or at all, or might not be possible on terms acceptable to us, in which case it would likely be necessary for us to limit the size or scope of the imetelstat development program;

31. The JSC conducted a data review of the IMbark study in March 2018 (prior to March 16, 2018). All of the patients in the IMbark study were taking imetelstat so the results were not "blinded," meaning that the JSC members could see how patients were faring on the drug. Accordingly, the JSC learned of the co-primary efficacy endpoint results (*i.e.*, spleen reduction and symptom score results) during that data review.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

32. On Friday, March 16, 2018, after the market closed, Geron filed with the SEC its annual report for the year ended December 31, 2017 on Form 10-K. Defendant Scarlett signed Geron's Form 10-K. In a section discussing the current status of IMbark, the Form 10-K stated in part:

In March 2018, Janssen completed a third internal data review of IMbark, based on a January 2018 data cut, to enable a protocol amendment to allow the long-term treatment and follow up of patients, ***including for survival***, and the JSC made the following observations and implemented the following actions:

- The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified.

- Outcome measures for efficacy, including spleen volume response and reductions in Total Symptom Score remain consistent with prior data reviews.

- ***With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm***.

- The trial is officially being closed to new patient enrollment. More than 100 patients have been enrolled in IMbark to date, which is expected to be adequate to assess overall survival. ***Patients who remain in the treatment phase may continue to receive imetelstat, and until the primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to***

7

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*the extent possible, until death, to enable an assessment of overall survival.*

- Based on the rate of deaths occurring in the trial, the JSC determined that the protocol-specified primary analysis, *which includes an assessment of overall survival*, will begin by the end of the second quarter of 2018.

- Upon the protocol-specified primary analysis, the main trial will be completed. The IMbark protocol is being amended to establish an extension phase of the trial to enable patients remaining in the treatment phase to continue to receive imetelstat treatment per investigator discretion. During the extension phase, standard data collection will primarily consist of safety information.

(Emphasis added).

33.     Thereafter, on Friday, March 16, 2018, Geron also issued a press release entitled "Geron Corporation Reports Fourth Quarter and Annual 2017 Financial Results and Recent Events." Geron's press release repeated the foregoing statements that were included in the Company's Form 10-K.

34.     On Monday, March 19, 2018, before the market opened, Geron held a conference call with investors and analysts to discuss the Company's fourth quarter and annual results, as well as recent Company events. On that call, defendant Scarlett discussed the IMbark study at length but chose not to address whether the primary efficacy endpoints had been satisfied. Instead, he trumpeted the fact that the median overall survival for all patients had not yet been reached after a follow-up of nineteen months, meaning that the final, median survival might be longer. He stated in relevant part:

This morning, I'll start my remarks with a summary of the results from the latest internal data review conducted by Janssen on the IMbark and an update on the projected timing of the protocol-specified primary analysis for IMbark and the subsequent potential continuation decision from Janssen. I'll then conclude with the status of the IMerge trial, including a recap of the data that was recently presented at the American Society for Hematology or ASH Annual Meeting, that was in last December.

As a reminder, IMbark is a Phase 2 clinical trial designed to test two doses of imetelstat, 9.4 milligrams per kilogram or 4.7 milligrams per kilogram, administered every three weeks in intermediate-2 two or high-risk MF patients who are refractory-2 or have relapsed after treatment with the JAK inhibitor. The planned March 2018 data review was primarily conducted to enable a protocol amendment that will allow the long-term treatment and follow-up of patients in the trial, including for survival.

8

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

In reviewing the data, which was based on a January 2018 data cut, the Collaboration's Joint Steering Committee, or JSC, made the following observations: first, the safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies and no new safety signals were identified; second, outcome measures for efficacy, including spleen volume responses and reductions in total symptom score remain consistent with the prior data reviews; third, ***with a median follow-up of approximately 19 months as of the January 2018 data cut, the median overall survival has not been reached in either dosing arm.***

\*          \*          \*

***Patients who remain in the treatment phase may continue to receive imetelstat, and until the primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to the extent possible, until death to enable an assessment of overall survival.***

\*          \*          \*

Upon the completion of the protocol-specified primary analysis, the main trial will be completed.

As a third action, the JSC determined that Janssen will amend the IMbark protocol to establish an extension phase of the trial to enable patients remaining in the treatment phase to continue to receive imetelstat per investigator discretion. During the extension phase, standard data collection will primarily consist of safety information. Patients will be continued to be followed for survival.

***The assessment of survival is important because we believe that a new treatment that could confirm improved survival would represent a meaningful clinical outcome for patients who are relapsed or refractory to the only approved MF treatment today.*** As experience with JAK inhibitors increases, both in the real world and clinical trial settings, we know that the majority of MF patients fail or stop JAK inhibitor treatment and data from recent literature and other sources suggest that the survival of these patients is limited.

For example, an analysis of real world data conducted by Janssen and presented at ASH in 2016 reviewed treatment patterns and outcomes of MF patients from two U.S. medical claims databases. ***This analysis suggested that once patients fail or discontinue ruxolitinib, mean overall survival is approximately seven months.*** Three other recently published and independent papers describing outcomes of MF patients after discontinuing JAK inhibitor treatment, either in the context of a clinical trial or through commercial supply, estimated median overall survival of approximately 14, 15 or 16 months, respectively. ***Thus, imetelstat potentially could address a significant unmet medical need if its use is associated with survival that is meaningfully longer than 14 to 16 months.***

(Emphasis added).

35.     As a result of these encouraging statements, the price of Geron's common stock dramatically increased from $3.37 per share to close at $4.34 per share the next trading day, on

an enormous volume of more than twenty-six million shares traded.  This increase was the result of artificial inflation caused by Defendants' misleading statements.

36.     The statements made by Defendants on March 16 and March 19, 2018 concerning the IMbark study and the median survival rates were materially misleading when made.  While Defendants are free to tout positive information about the IMbark study, under the federal securities laws, they are bound to do so in a manner that will not mislead investors.  This responsibility includes disclosing any additional adverse information that cuts against the voluntarily revealed, positive information.   Here, Defendants' statements were materially misleading for at least the following reasons:

(a)     Defendants chose to affirmatively tout the purportedly positive results of one of fourteen secondary outcome measures—overall survival—while knowingly omitting the results of the two primary endpoints, which the IMbark study had already failed to achieve;

(b)     Defendants touted the study's overall survival, which had not yet been reached after nineteen months, and compared it to purportedly "real world" patient outcomes of overall survival of seven months in a study presented by Janssen in 2016, and fourteen to sixteen months in three other studies.  This was materially misleading since it is impossible to fairly compare the IMbark study to the other studies without knowing the baseline disease characteristics of the myelofibrosis patients enrolled in the study, which Geron refused to disclose.  And when compared to patients in the other Janssen study who received a secondary treatment, IMbark's nineteen-month median survival was not meaningful; and

(c)     due to the foregoing, there was a significantly increased risk that Janssen would decline to continue with its collaboration with Geron.

37.     Then, on March 27, 2018, at 4 pm ET, defendant Scarlett made a presentation at the 17th Annual Needham Healthcare Conference in New York City during which he repeated some of the earlier misleading statements.  At the presentation, he introduced a slide entitled

10

"IMbark Internal Data Reviews, Findings to Date." The slide, which was also posted on Geron's website, purported to summarize "Internal data reviews completed by Janssen in September 2016, April 2017 and March 2018." It further stated, "Activity within multiple outcome measures observed, suggesting clinical benefit. . . ." These measures were then listed, including "Range of reductions in spleen volume" and "Decreases in Total Symptoms Score." The slide also stated, "Median OS not reached in either dosing arm (with median follow-up of ~19 months at January 2018 data cut)."

38.     Defendants continued to push the increased survival rate narrative in the Company's Q1 2018 Form 10-Q dated May 10, 2018 disclosing that: "The JSC concluded that as of January 2018, median follow up was approximately 19 months, and median overall survival had not been reached in either dosing arm." And, in the Company's Q2 2019 Form 10-Q dated July 31, 2018, they again disclosed: "The JSC also concluded that as of the January 2018 data cut-off date, with a median follow up of approximately 19 months, median overall survival had not been reached in either dosing arm."

39.     Defendants' statements at the March 27, 2018 conference and in the Q1 and Q2 Form 10-Qs filed on May 10 and July 31, 2018, respectively, continued to mislead investors, particularly when considered in the context of Defendants' earlier statements. These additional statements were materially misleading when made for the following reasons:

        (a)     Defendants continued to publicize the purportedly positive results of one of fourteen secondary outcome measures—overall survival—while knowingly omitting the results of the two primary endpoints, which the IMbark study had already failed to achieve;

        (b)     Defendants continued withhold the baseline disease characteristics of the myelofibrosis patients enrolled in the IMbark study which would allow investors to fairly compare the overall survival in the IMbark study to the other studies previously referenced by Defendants; and

        (c)     due to the foregoing, there was a significantly increased risk that Janssen would decline to continue with its collaboration with Geron.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

40.     In the meantime, capitalizing of the Company's artificially inflated stock price, Geron sold more than $83 million in common stock to the unsuspecting public.

41.     According to Geron's Form 10-Q filed with the SEC on July 31, 2018, during the six months ended June 30, 2018, Geron sold common stock via MLV & Co. investment bank for net proceeds of $47,651,000.

42.     Also, as stated in that Form 10-Q, Geron sold common stock via B. Riley FBR, Inc. investment bank for another $36,208,000 in net proceeds in the three months ended June 30, 2018.

## THE TRUTH BEGINS TO EMERGE

43.     On the morning of March 27, 2018, Adam Feuerstein, a veteran biotech journalist, published an article on STAT News, an online life sciences publication, entitled "The top-performing biotech stock this year has surged on flimsy data."  In the article, Feuerstein called out Geron and Scarlett for intentionally misleading the market with their statements on March 16 and March 19, 2018.  The article stated in part:

> ***Shares of Geron have more than tripled in price since January, with most of the gains coming in the past week after CEO John Scarlett suggested the drug, imetelstat, is helping patients with the bone marrow disorder live longer.***

> ***That proof doesn't exist.***  Still, on his words, the company's market value is now approaching $1 billion — a level that is both remarkable and hard to justify for such a risky drug-development program.

> \*          \*          \*

> On a conference call last week, Scarlett said a review of the clinical trial in March showed median overall survival for all the patients had not yet been reached after a follow-up of 19 months.  With the study still open, the final, median overall survival might be longer, he said.

> Is a median overall survival of 19 months meaningful for these myelofibrosis patients?

> Yes, said Scarlett, even though the company's study lacks a control arm to compare against imetelstat for survival.

> Undeterred, Scarlett compared the survival update from Geron's imetelstat study to a separate analysis of "real world" myelofibrosis patient outcomes presented at a medical meeting by Janssen in 2016.

> For myelofibrosis patients who discontinued or no longer responded to Jakafi, median overall survival was seven months in the Janssen analysis, said Scarlett.

12

That single data makes imetelstat look better.  ***But the rest of the study undermines his argument.***

Of the 430 myelofibrosis patients who received Jakafi as a first-line therapy (the patient group highlighted by Scarlett), only 15 percent went on to receive a second-line treatment with a different drug.  The other 85 percent of patients received no further treatment, suggesting they were too frail and close to death, according to the Janssen analysis.

***Janssen also looked at myelofibrosis patients who received another treatment after Jakafi. These patients lived a lot longer than seven months.***

Sixty-three patients received Jakafi first and then a different second-line treatment.  Their median survival was 14 months.  Another 49 patients started on Jakafi and then received Jakafi again.  ***Their median survival was 30 months. Blended together, the median survival for these 112 patients was approximately 22 months.***

***By that comparison — which Scarlett did not mention last week — the 19-month median survival for imetelstat patients doesn't look as promising.***

***I asked Geron and Janssen to disclose the baseline disease characteristics of the 100 myelofibrosis patients enrolled in their Phase 2 study.   That information — easily shared without compromising the conduct of the study — would help investors better interpret the interim imetelstat survival data.***

***Both companies declined the request.***

***I also asked Geron and Janssen to explain why they've delayed by almost one year the disclosure of primary endpoint results from the Phase 2 study that would show, definitively, if myelofibrosis patients respond to treatment with imetelstat.***

***Again, they declined to share those data.***

***This is perhaps the most troubling aspect of the companies' behavior. Myelofibrosis drugs are approved based on their ability to shrink enlarged spleens and reduce overall disease symptoms.  These two efficacy measures are the co-primary endpoints of the imetelstat study, not survival, which is listed as the fifth secondary endpoint.***

The last myelofibrosis patient to enroll in the Geron and Janssen study did so in October 2016.  The patients are treated with imetelstat for 24 weeks, ***which means spleen and symptom responses have been available to the companies since April 2017.***

That's almost one year ago, so why haven't these results been disclosed publicly?  "We are focused on survival in this myelofibrosis patient population," Geron spokesperson Anna Krassowska told me.

It's reasonable to assume Geron would be screaming from the biotech mountaintop had imetelstat showed meaningful disease activity in these hard-to-treat myelofibrosis patients.  (Something other companies developing competing drugs have done.)  ***Keeping those objective data under wraps — while focusing***

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*instead on a fuzzy survival talking point — is a significant red flag against imetelstat.*

\*       \*       \*

Imetelstat is Geron's only drug asset.  If the drug fails or if Janssen decides to give up on the partnership — that go/no go decision will be made in the third quarter — Geron will be left with little more than $100 million in cash.

Yet the surge in Geron's stock price over the past week has pushed the biotech's market value close to $1 billion.

Shaky.

(Emphasis added).

44.    On this news, Geron shares, which had closed at $5.98 per share on March 26, 2018, dropped 29% over the next two days to close at $4.23 per share on March 28, 2018, on high volume.  Even after this partial disclosure of Defendants' deception, investors remained largely in the dark.

45.    Not until September 27, 2018, did Defendants finally admit that IMbark was a failure.  Specifically, on that day, Defendants issued a press release which stated in relevant part:

**IMbark Protocol-Specified Primary Analysis Highlights**

IMbark was designed as a Phase 2 clinical trial to evaluate two starting dose levels of imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered by intravenous infusion every three weeks) in approximately 200 patients with Intermediate-2 or High-risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor.

The co-primary efficacy endpoints for the trial are spleen response rate, defined as the proportion of patients who achieve a ≥35% reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a ≥50% reduction in Total Symptom Score, at 24 weeks. Key secondary endpoints are safety and overall survival.

For the 9.4 mg/kg dosing arm (n=59), highlights from the primary analysis included a spleen response rate of 10% and a symptom response rate of 32%. No patients achieved complete remission, and one patient achieved partial remission.

46.    Thus, the IMbark study showed only a 10% decrease in spleen volume, when 35% or more was required for success, and a 32% reduction in Total Symptom Score, when at least 50% was needed.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

47.     Defendants also announced that Janssen had terminated its partnership with the Geron for the development of imetelstat.

48.     The same day the full results were finally disclosed, Adam Feuerstein published another article on STAT News concerning Geron.  The article stated in relevant part: "Back in March, Geron CEO John Scarlett ignited a steep run higher in the stock price with a suggestion, uttered on a conference call, that imetelstat was prolonging survival in patients with the bone marrow disorder myelofibrosis."   Feuerstein characterized this move as a "bait-and-switch tactic":

> The Phase 2 study was designed primarily to determine if imetelstat could shrink spleens and improve myelofibrosis disease symptoms. ***Geron and Janssen were keeping these data hidden, even though they were readily available.  Shifting attention to survival was a smokescreen.***
>
> On Thursday, we learned why.  The spleen response rate to imetelstat in the myelofibrosis study was a disappointing 10 percent."

(Emphasis added).

49.     Feuerstein noted in the article that "Geron raised $84 million through highly dilutive stock sales in the second quarter," ultimately concluding, "[t]aking advantage of the hyped-up stock price earlier this year was a fiscally smart move, although that's small consolation to shareholders left holding the bag."

50.     As a result of these disclosures, the price of Geron's common stock dropped from $6.23 per share to $2.31 per share in one day, a decrease of over 62%.  This decrease in the price of Geron's securities was a result of the artificial inflation caused by Defendants' misleading statements coming out of the price.

## LOSS CAUSATION

51.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Geron common stock and operated as a fraud or deceit on purchasers of Geron common stock.  As detailed above, when the truth about Geron's misconduct was revealed over time, the value of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's prices.  The declines in the price of Geron shares were the direct result of the nature and

1   extent of Defendants' fraud finally being revealed to investors and the market.  The timing and

2   magnitude of the share price declines negate any inference that the losses suffered by Plaintiff

3   and other members of the Class were caused by changed market conditions, macroeconomic or

4   industry factors, or Company specific facts unrelated to the defendants' fraudulent conduct.  The

5   economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members, was a direct result

6   of Defendants' fraudulent scheme to artificially inflate the prices of the Company's stock and

7   the subsequent significant decline in the value of the Company's stock when defendants' prior

8   misrepresentations and other fraudulent conduct were revealed.

9         52.    At all relevant times, Defendants' materially false and misleading statements or

10  omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff

11  and other Class members.  Those statements were materially false and misleading through their

12  failure to disclose a true and accurate picture of Geron's business, operations, and financial

13  condition, as alleged herein.  Throughout the Class Period, Defendants issued materially false

14  and misleading statements and omitted material facts necessary to make Defendants' statements

15  not false or misleading, causing the prices of Geron's common stock to be artificially inflated.

16  Plaintiff and other Class members purchased Geron stock at those artificially inflated prices,

17  causing them to suffer damages as complained of herein.

18                                **SCIENTER**

19        53.    During the Class Period, Defendants had both the motive and opportunity to

20  conduct fraud.  They also had actual knowledge of the misleading nature of the statements they

21  made or acted in reckless disregard of the true information known to them at the time.  In so

22  doing, Defendants participated in a scheme to defraud and committed acts, practices, and

23  participated in a course of business that operated as a fraud or deceit on purchasers of Geron

24  common stock during the Class Period.

25                              **NO SAFE HARBOR**

26        54.    Geron's verbal "Safe Harbor" warnings accompanying any oral forward-looking

27  statements ("FLS") issued during the Class Period were ineffective to shield those statements

28  from liability.

55.    Defendants are also liable for any false or misleading FLS pleaded herein because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Geron who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

56.    In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

57.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and other members of the Class purchased Geron common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

17

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

58.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972).  Here, the Class' claims are also grounded on Defendants' failure to disclose material adverse information regarding the actual results of the IMbark study—which were known to Defendants at the time to be a complete failure—information that the defendants should have disclosed and proof that positive reliance is not a prerequisite to recovery.  Instead, the withheld facts must be material in the sense that a reasonable investor may have considered them important in making investment decisions.   Based on the alleged omissions herein, this requirement is satisfied here.

59.     At all relevant times, the market for Geron common stock was efficient for the following reasons, among others:

> (a)     As a regulated issuer, Geron filed periodic public reports with the SEC; and

> (b)     Geron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Geron during the Class Period (the "Class").  Excluded from the Class are Defendants, directors and officers of Geron and Janssen, and their families and affiliates.

61.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Geron had more than 182 million shares outstanding, owned by thousands of persons.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

62.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a)     Whether the 1934 Act was violated by Defendants;
>
> (b)     Whether Defendants omitted and/or misrepresented material facts;
>
> (c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;
>
> (d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;
>
> (e)     Whether the prices of Geron common stock were artificially inflated; and
>
> (f)     The extent of damage sustained by Class members and the appropriate measure of damages.

63.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

64.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

**For Violation of § 10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

66.     Plaintiff incorporates ¶¶ 1-65 by reference.

67.     During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

19

68.   Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   Employed devices, schemes, and artifices to defraud;

(b)   Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Geron common stock during the Class Period.

69.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Geron common stock.  Plaintiff and the Class would not have purchased Geron common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

70.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Geron securities during the Class Period.

## COUNT II

### For Violation of § 20(a) of the 1934 Act
### Against All Defendants

71.   Plaintiff incorporates ¶¶ 1-70 by reference.

72.   Defendant Scarlett acted as a controlling person of Geron within the meaning of § 20 of the 1934 Act.  By virtue of his position and his power to control public statements about Geron, defendant Scarlett had the power and ability to control the actions of Geron and its employees.  Geron controlled defendant Scarlett and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to § 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

(a)   WHEREFORE, Plaintiff prays for judgment as follows:

(b)   Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1      (c)    Awarding Plaintiff and the members of the Class damages and interest;

2      (d)    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

3      (e)    Awarding such equitable/injunctive or other relief as the Court may deem
              just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  January 23, 2020                          **JOHNSON FISTEL, LLP**

                                          By:  */s/ Brett M. Middleton*
                                               BRETT M. MIDDLETON

                                               FRANK J. JOHNSON
                                               KRISTEN O'CONNOR
                                               655 West Broadway, Suite 1400
                                               San Diego, CA 92101
                                               Telephone: (619) 230-0063
                                               Facsimile: (619) 255-1856
                                               BrettM@johnsonfistel.com
                                               FrankJ@johnsonfistel.com
                                               KristenO@johnsonfistel.com

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, MICHAEL TOLLEN , declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 9/11/18 | 4000 | 5.67 |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| | | |
| | | |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22 day of January 2020.

DocuSigned by:

*Michael Tollen*

18CB151E75274D1...

MICHAEL TOLLEN