**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (*pro hac vice* to be filed)
Jeffrey P. Campisi (*pro hac vice* to be filed)
850 Third Avenue
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-771
*rkaplan@kaplanfox.com*
*jcampisi@kaplanfox.com*

*Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| JULIA JUNGE and RICHARD JUNGE, on behalf of themselves and a class of similarly situated investors,<br><br>                    Plaintiff,<br><br>        v.<br><br>GERON CORPORATION and JOHN A. SCARLETT,<br><br>                    Defendants. | Case No. 3:20-cv-00547-WHA<br><br>*Related to*<br><br>Case No. 3:20-cv-01163-WHA |
| EUGENE CONNOR, on behalf of themselves and a class of similarly situated investors,<br><br>                    Plaintiff,<br><br>        v.<br><br>GERON CORPORATION and JOHN A. SCARLETT,<br><br>                    Defendants. | **Class Action**<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**Jury Trial Demanded** |

**TABLE OF CONTENTS**

Page

I.      SUMMARY OF THE ACTION ................................................................................. 1

II.     INTRODUCTION ................................................................................................... 5

III.    JURISDICTION AND VENUE .............................................................................. 13

IV.     PARTIES ................................................................................................................ 13

V.      BACKGROUND .................................................................................................... 15

        A.      Geron's Collaboration and License Agreement with Janssen .............................. 15

        B.      The CLA's Joint Geron-Janssen Governance Committees ................................... 16

        C.      IMbark Was a Phase 2 Clinical Study of Imetelstat for MF ............................... 18

        D.      The JSC Reviews IMbark Trial Data .................................................................. 20

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        MATERIAL OMISSIONS DURING THE CLASS PERIOD ......................................... 23

VII.    THE TRUTH BEGINS TO EMERGE ..................................................................... 40

VIII.   LOSS CAUSATION ............................................................................................... 42

IX.     ADDITIONAL SCIENTER ALLEGATIONS ......................................................... 43

X.      NO SAFE HARBOR .............................................................................................. 44

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE
        MARKET ................................................................................................................ 44

XII.    CLASS ACTION ALLEGATIONS ......................................................................... 46

XIII.   CAUSES OF ACTION ........................................................................................... 47

        COUNT I  FOR VIOLATION OF § 10(B) OF THE EXCHANGE ACT AND
                  RULE 10B-5 AGAINST ALL DEFENDANTS ................................................ 47

        COUNT II  FOR VIOLATION OF § 20(A) OF THE EXCHANGE ACT
                   AGAINST DEFENDANT SCARLETT ........................................................ 48

PRAYER FOR RELIEF .................................................................................................... 48

JURY DEMAND ............................................................................................................... 49

Lead Plaintiffs Julia and Richard Junge, on behalf of themselves and a class of similarly situated investors ("Plaintiff"), by and through Plaintiff's counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: 1) the public filings made by Geron Corporation ("Geron" or the "Company") with the United States Securities and Exchange Commission ("SEC"); 2) press releases and media reports issued by and disseminated by the Company; 3) analyst reports, media reports, and other publicly disclosed reports and information about the Company; 4) conference calls with Company executives, analysts, and investors; 5) information based on consultation with experts in loss causation, economic loss, and hematology; and 6) publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Geron's common stock.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.      **SUMMARY OF THE ACTION**

1.      This is a securities class action on behalf of all purchasers of Geron common stock between March 19, 2018 and September 26, 2018, inclusive (the "Class Period"), who were damaged thereby (the "Class"). The claims asserted herein are alleged against Geron, and the Company's President and Chief Executive Officer ("CEO") John A. Scarlett ("Scarlett"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

2.      Myelofibrosis ("MF") is a rare, chronic blood cancer in which excessive scar tissue forms in the bone marrow and impairs its ability to produce normal blood cells. MF has the worst prognosis and poorest quality of life of all the chronic blood cancers. MF causes severe debilitating symptoms, including an enlarged spleen (splenomegaly), which causes pain and negatively affects white and red blood cell production, leading to anemia and increased risk of infection.  Other severe and debilitating symptoms that degrade quality of life include abdominal pain, fatigue, fever,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

weight loss, bone pain, and itching.  Because MF patients have severe disease burden and reduced quality of life, disease management is focused on the relief of symptoms and improvement in quality of life.  Due to MF's severe debilitating symptoms, MF patients are not likely to undertake a treatment that does not substantially reduce these symptoms.

3.     Before the Class Period, Defendants, along with Geron's development partner, Janssen Biotech Inc. ("Janssen"), a division of Johnson & Johnson, were conducting a Phase 2 clinical trial called IMbark on the Company's only drug candidate, imetelstat.  IMbark was designed to ascertain whether imetelstat was effective in reducing spleen size and reducing debilitating symptoms in MF patients. There was no control group, *i.e.*, patients who were given a placebo.

4.     In a clinical study's protocol, a primary endpoint is the planned outcome measure that is the most important outcome for evaluating the effect of a treatment.  IMbark's co-primary endpoints measured whether patients experienced meaningful reduction in spleen size of ≥35%, and a reduction of debilitating symptoms of ≥50%, as measured by a uniform scoring system. Reduction in spleen volume was selected because splenomegaly (an enlarged and often painful spleen) is a hallmark symptom of MF and can be objectively measured.  Symptom response rate scoring provided a uniform data set and a second objective method to assess whether imetelstat was reducing the severity of a patient's symptoms and improving quality of life.  Moreover, these co-primary endpoints were selected by Defendants because they were the endpoints approved by the U.S. Food and Drug Administration ("FDA") for its approval of Jakafi (ruxolitinib), then the only approved drug for adults with certain types of MF.

5.     In contrast, a secondary endpoint is not as important as the primary endpoint outcome measure for evaluating the effect of a drug, but is still of interest. Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm, and, as a result, overall survival data in such studies may be unreliable due to variability in patient selection and baseline patient health conditions, and therefore this outcome may be biased and overstate or understate drug efficacy.  To the contrary, IMbark's two primary endpoints, reduction

of spleen size and reduction of debilitating symptoms, were measurable objectively and were the key endpoints to determine whether imetelstat was effective.

6. By the start of the Class Period, Defendants and Janssen had learned of material, adverse results from the IMbark study. The IMbark study data, which was available to Defendants and Janssen, but not investors, showed that 90% of patients did not experience a reduction in spleen volume of ≥35%, and 68% did not experience a reduction in debilitating symptoms of ≥50%, results that indicated imetelstat was not effective in improving the debilitating symptoms of MF and patient quality of life.

7. Moreover, in contrast to the results from a pilot study at the Mayo Clinic on imetelstat, which showed over 21% of patients had achieved a complete or partial remission (the disappearance of cancer in response to treatment), in IMbark, no patients achieved complete remission, and only one patient achieved partial remission—results that indicated imetelstat did not have a disease modifying effect.

8. In light of IMbark's failure to produce evidence of meaningful efficacy for the study's two main endpoints and failure to demonstrate it had a disease modifying effect, *i.e.*, that it was a complete or partial cure for MF, Defendants shifted focus to IMbark's study data concerning overall survival, a secondary, less important endpoint that was unreliable because IMbark lacked a control group.

9. By March 2018, Janssen determined it had acquired enough data and closed the IMbark trial. Janssen was disappointed with the IMbark study data and did not agree that IMbark's overall survival data demonstrated imetelstat's clinical efficacy.

10. IMbark's material, adverse results and Janssen's negative view of the study data were a disaster for Geron because Janssen was evaluating whether to continue its partnership with Geron and whether to make a milestone payment to Geron of at least $65 million in 2018, based, in material part, on the IMbark study results. The material, adverse results and Janssen's negative view of them, put Defendants on notice that it was probable that Janssen would terminate its agreement with Geron, thereby shifting all of the financial burden to Geron to continue development of imetelstat, if it determined to continue its development.

11.     During the Class Period, Defendants violated the federal securities laws by covering up the material, adverse results of the IMbark study, making misleading representations concerning the IMbark study data results and the risks attendant to the imetelstat program, and concealing that Janssen was disappointed with the IMbark study data and did not agree that IMbark's overall survival data demonstrated imetelstat's efficacy.

12.     Knowing, or disregarding with deliberate recklessness, that they would no longer have Janssen as a partner to contribute funding for further studies of imetelstat, without disclosing to the public the adverse results of the IMbark study, Defendants raised capital from unwitting investors through a series of at-the-market sales of inflated Geron stock.  Within weeks of a March 2018 meeting and nonpublic review of the latest negative IMbark study data by Geron and Janssen executives, Defendants began to raise over $84 million in offerings of inflated Geron stock, and just weeks before the end of the Class Period, in what for most companies would have been a blackout period, Geron insiders, including its general counsel and a director, sold millions of dollars of inflated Geron stock near Class Period-high prices.  Prior to raising this capital, Geron had not raised capital since 2015, and the selling insiders had never sold Geron stock on the open market before their respective sales.

13.     Indeed, one of the Geron insiders, its executive vice president and general counsel, exercised over 1.3 million options to acquire Geron shares, and sold 100% of the Geron shares he acquired—this was his first open market sale of Geron stock in his six years as Geron's general counsel—for proceeds of over $6.1 million just weeks before Geron disclosed the bad news about the IMbark study data and Janssen's termination of its partnership with Geron.  The insiders' sales of their Geron shares at inflated prices on August 24 and September 13, 2018, at a time when they knew the adverse results of the IMbark study and that the disclosure to the public of Janssen's decision whether to continue licensing imetelstat was imminent (on or before September 30, 2018), allowed them to wrongfully avoid a loss of over $4.6 million in the market value of their Geron shares.

14.     When the truth was disclosed at the end of the Class Period, Geron's stock crashed by over 71% and has never recovered.  One biotech reporter stated Defendant Scarlett's shifting

attention to the secondary endpoint of survival was a "smokescreen" for IMbark's adverse results and that his conduct was a "bait-and-switch tactic." Further, an article published on SeekingAlpha[α], which provides financial market news and analysis, noted Geron disclosed "disappointing data" that suggested imetelstat "is not effective in the treatment of MF" and connected Janssen's termination decision to the disappointing, previously undisclosed IMbark study data.

## II.    INTRODUCTION

15.    Geron is a biopharmaceutical company. The Company's only drug product candidate is imetelstat. At or around the start of the Class Period, Geron had 15 full-time employees and three part-time employees.

16.    In 2013, Defendants disclosed the results of a pilot study of MF patients taking imetelstat that were considered a breakthrough because, unlike existing therapies that treated MF symptoms, but did not stop its progression, the pilot study data suggested imetelstat reversed progression of the disease *and* reduced symptoms. The pilot study showed 39% of patients with enlarged spleens achieved reduction in spleen size of ≥50%, and symptom responses of ≥50% were observed in 77% of patients. Furthermore, over 21% experienced a complete or partial remission, and another 18% experienced clinical improvements, for a total of over 40% of patients experiencing a complete or partial remission, or clinical improvement. Defendant Scarlett described these results as "unprecedented" and "durable".

17.    In November 2014, capitalizing on the promising results from the pilot study, Geron entered into a collaboration and licensing agreement ("CLA") with Janssen for the development of imetelstat for all indications in oncology, including MF, which resulted in a $35 million payment from Janssen to Geron, with the potential for hundreds of millions more if Janssen determined imetelstat proved effective in treating MF and validated the results of the pilot study.

18.    In 2015, Defendants and Janssen initiated the IMbark study. Under the CLA, while Janssen was responsible for conducting the IMbark study, Geron monitored the progress of the study and the data collected through the Joint Steering Committee ("JSC"), which consisted of both senior Geron and Janssen executives. Melissa A. Kelly Behrs ("Behrs"), Geron's Executive Vice President, Business Development and Portfolio & Alliance Management, and Andrew J. Grethlein

("Grethlein"), Geron's Executive Vice President, Development and Technical Operations, were members of the JSC and its various governance and other committees.  Behrs and Grethlein directly reported to Defendant Scarlett.

19.     Patients with MF often have an enlarged spleen and other debilitating constitutional, or systemic, symptoms that degrade quality of life.  Accordingly, IMbark's co-primary endpoints sought to measure objectively, without a control group, whether imetelstat improved quality of life symptoms, namely: 1) the proportion of patients who achieved a ≥35% reduction in spleen volume, objectively assessed by imaging at 24 weeks; and 2) the proportion of patients who achieved a ≥50% reduction in ten other debilitating symptoms, at 24 weeks using a uniform scoring system.

20.     Jakafi was approved by the FDA with Phase 3 data showing 42% of patients achieved a greater than 35% reduction in spleen volume at week 24 and achieved high levels of statistical significance for improvement in severe and debilitating symptoms (at week 24, the percentage of patients with a greater than or equal to 50% improvement in the TSS was 45.9% in persons treated with Jakafi and 5.3% in patients treated with placebo).  Almost all patients treated with Jakafi had some reduction in spleen volume, whereas the majority of patients in the control group receiving placebo had spleen growth.  In addition, a Phase 2 study of Jakafi, which, like IMbark, did not have a control arm, showed 48% experienced spleen reductions of ≥35%, and rapid and lasting improvement in symptom score, with 58% of patients achieving a reduction in debilitating symptoms ≥50% at six months.

21.     IMbark was not a blinded study, therefore, members of the JSC, through periodic data reviews, had access to objective data that showed whether patients on imetelstat met the study's co-primary endpoints.

22.     IMbark had 14 secondary endpoints to measure other patient responses to imetelstat, including overall survival.  Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm, and as a result, this endpoint was unreliable due to variability in patient selection and baseline patient health conditions, and as a result, could be biased and overstate or understate treatment efficacy.

23.     Geron senior executives, Behrs and Grethlein, as members of the JSC, reviewed data from IMbark in October 2016 and April 2017, as did Janssen representatives.  The data were not publicly disclosed to investors at the time the JSC reviewed them.

24.     After April 2017, additional safety and efficacy data from IMbark continued to be generated from patients who continued treatment with imetelstat, and Janssen began evaluating the IMbark study data.

25.     In October 2017, in response to an FDA information request regarding the benefit-risk profile of imetelstat in relapsed or refractory MF and justification for continued treatment of patients enrolled in the IMbark study, Janssen submitted to the FDA data from the JSC's April 2017 data review, as well as additional efficacy and safety data, including information about deaths and overall survival in IMbark.

26.     By the start of the Class Period, Geron senior executives, Behrs and Grethlein, as members of the JSC, reviewed the IMbark study data as of January 2018, as did Janssen.  Janssen was disappointed in the IMbark study data and viewed the data negatively because the results of the IMbark study showed that imetelstat was not effective in improving quality of life because the vast majority of patients in the IMbark study had failed to meet the trial's co-primary endpoints at week 24.  90% of patients did not experience a reduction in spleen volume of $\geq 35\%$, and 68% did not experience a reduction in debilitating symptoms of $\geq 50\%$.  No patient experienced a complete remission, as was seen in the imetelstat pilot study.  In sum, the results of IMbark showed imetelstat did not produce the unprecedented and durable results seen in the earlier imetelstat pilot study of MF patients treated with imetelstat, or the outcomes produced in Phase 2 studies of other second-line MF treatments.

27.     The IMbark study data showed imetelstat was ineffective as a second-line therapy in reducing spleen volume and symptoms.  For example, in another Phase 2 study of MF patients treated with pacritinib, a second-line MF therapy, 37% of patients achieved a reduction in spleen volume of $\geq 35\%$, and 48% achieved a reduction in debilitating symptoms of $\geq 50\%$.

28.     In light of IMbark's failure to produce evidence of meaningful efficacy for the study's two main endpoints and failure to demonstrate it had a disease modifying effect, Defendants

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

knew, or disregarded with at least deliberate recklessness, that it was probable that Janssen would terminate its collaboration. Defendants shifted focus to IMbark's data concerning overall survival, a secondary, less important endpoint that was unreliable because IMbark lacked a control group, and because comparison of IMbark's data to overall survival data produced in unrelated studies was unreliable due to variability in patient selection and baseline patient health conditions.

29.     In March 2018, Janssen determined that it had acquired sufficient data to evaluate any purported overall survival benefit, and closed the IMbark study. The IMbark study data did not show sufficient clinical benefit to support further development of imetelstat by Janssen, which doomed Geron's partnership with Janssen because it would decide whether to continue to license imetelstat based, in material part, on the IMbark study data after internal discussions and approvals.

30.     External consultants were similarly disappointed with the IMbark study data. For example, Defendants and Janssen provided Dr. John Mascarenhas, who had in the past received research funding from Janssen in connection with MF research, access to the IMbark study data in order to prepare an abstract for submission to the American Society of Hematology (ASH) Annual Meeting and Exposition. During a public conference call after the Class Period, Dr. Mascarenhas stated he was disappointed by the IMbark study's spleen and symptoms responses, and that there were no complete remissions, as seen in the imetelstat pilot study at the Mayo clinic.

31.     During the Class Period, in a break with Defendants' long-standing rule of not disclosing IMbark study data reviewed by the JSC, Defendant Scarlett selectively announced purportedly positive efficacy data about IMbark's median overall survival rate, one of 14 secondary, much less important endpoints in the IMbark study.

32.     Overall survival measures are how long patients taking the drug live after starting treatment. Median overall survival is the point in time during a study when 50% of the patients are still alive, and 50% have died. The longer it takes to reach median overall survival, the longer a majority of the patients in the study are living, which may indicate drug efficacy. Defendants repeatedly represented that "with a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm" in the IMbark study. Not having reached the median overall survival at 19 months appeared to be positive because it indicated that at least

50% of the patients would likely live longer than 19 months.  After the end of the Class Period when full disclosure was made and Geron's stock price crashed, a biotech reporter described Defendant Scarlett's conduct as a "smokescreen" for IMbark's disappointing results on the primary endpoints and a "bait-and-switch tactic".

33.     Even assuming, *arguendo*, that imetelstat showed an improvement in overall survival (which was dubious because there was no control group in IMbark), it was misleading for Defendants to represent that IMbark study data suggested MF patients might see an increase in survival without disclosing that the IMbark data showed that 90% of patients did not experience a reduction in spleen size of ≥35%, and 68% of patients did not experience a reduction in symptoms of ≥50%, the two key primary endpoints and the most important clinical outcomes being studied in IMbark, that the IMbark data failed to show that imetelstat had a disease modifying effect as was seen in the pilot study, and that, despite Defendants' positive view of the IMbark study's overall survival data, Janssen did not agree with Defendants' view.

34.     Based on the data and work performed on IMbark, Defendant Scarlett falsely represented that development of imetelstat had been "derisked," creating the misimpression that the data from the IMbark study showed imetelstat was effective in reducing spleen size and severe and debilitating symptoms, caused improved quality of life, and that the IMbark results weighed in favor of Janssen extending its licensing agreement.

35.     In truth, the data from the IMbark study showed imetelstat was not effective in reducing spleen size or reducing severe symptoms for the vast majority of patients, IMbark's overall survival data was unreliable, and Janssen viewed the IMbark data negatively, all of which were material facts that materially increased the risks attendant to the imetelstat program, rather than derisking the imetelstat program.  Once Defendant Scarlett made purportedly positive representations about the results of IMbark, he had a duty to disclose the negative results that, for the vast majority of IMbark patients, the two primary endpoints had not been achieved, and that IMbark results did not provide any evidence of complete or partial remissions, as seen in the earlier imetelstat pilot study.

36.     Defendant Scarlett's misleading representations caused Geron shares to trade at artificially inflated prices, and knowing, or disregarding with deliberate recklessness, that Janssen would no longer fund the development of imetelstat and Geron would not receive a milestone payment of at least $65 million from Janssen in 2018, Defendants made representations that inflated Geron's stock price, and then took full advantage of Geron's inflated stock price by selling more than $84 million of its common stock at inflated prices in at-the-market offerings during the period from March through July 2018.[1]

37.     On August 24, 2018, only weeks before Geron's disclosures that caused its stock price to crash and while knowing that disclosure of Janssen's decision was imminent, for the first time in six years as Geron's general counsel, Stephen Rosenfield ("Rosenfield"), Geron's Executive Vice President, General Counsel and Corporate Secretary, sold Geron shares on the open market after he exercised 1,362,250 options to purchase Geron shares and sold 100% of the shares he acquired for gross proceeds of over $6.1 million (approximately 74% of his Geron holdings including options).  Rosenfeld's sales just weeks before the end of the Class Period, when Geron shares crashed after making full disclosures, allowed him to wrongfully avoid over $3.7 million in loss of value of his Geron shares.  Had he continued to hold his shares until after the end of the Class Period, their value would have declined from $6.1 million to approximately $2.4 million.

38.     On September 13, 2018, just days before the September 27 disclosure of negative news while knowing that disclosure of Janssen's decision was imminent, Robert J. Spiegel ("Spiegel"), a Geron director, for the first time ever in his nearly eight years as a member of Geron's board, sold Geron shares on the open market after he exercised 175,000 options to purchase Geron shares at prices between $1.10 and $5.29 per share, and sold 100% of the shares he acquired (approximately 54% of his Geron holdings including options), at $6.85 per share for gross proceeds of  $1,198,750.  Spiegel's sales just days before the end of the Class Period, when Geron shares crashed after full disclosures to the public, allowed him to wrongfully avoid over $890,750 in loss

---

[1] An at-the-market offering is a secondary offering of stock through which newly issued shares are sold over time into the secondary trading market through a designated broker-dealer at prevailing market prices.

of value of his Geron shares.  Had he continued to hold his shares until after the end of the Class Period, their value would have declined from approximately $1.2 million to approximately $308,000.

39.     On September 27, 2018, before the market opened, Defendants issued a press release disclosing the material, adverse results of the IMbark study.  Not coincidentally, Defendants further announced that Janssen had decided to terminate its partnership with Geron. Defendant Scarlett caused Geron to issue a press release that disclosed the disappointing IMbark study data results, which Defendants were aware of by the beginning of the Class Period:

> **IMbark Protocol-Specified Primary Analysis Highlights**
>
> IMbark was designed as a Phase 2 clinical trial to evaluate two starting dose levels of imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered by intravenous infusion every three weeks) in approximately 200 patients with Intermediate-2 or High-risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor.
>
> The co-primary efficacy endpoints for the trial are spleen response rate, defined as the proportion of patients who achieve a ≥35% reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a ≥50% reduction in Total Symptom Score, at 24 weeks. Key secondary endpoints are safety and overall survival.
>
> ***For the 9.4 mg/kg dosing arm (n=59), highlights from the primary analysis included a spleen response rate of 10% and a symptom response rate of 32%. No patients achieved complete remission, and one patient achieved partial remission.*** The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified. The most common adverse events were cytopenias. At the time of the primary analysis, median overall survival had not been reached after 23 months of median follow-up.

(Emphasis added).

40.     The same day the full results were finally disclosed, an article on STAT News by biotech reporter Adam Feuerstein concerning Geron's disclosures stated in relevant part: "Back in March, Geron CEO John Scarlett ignited a steep run higher in the stock price with a suggestion, uttered on a conference call, that imetelstat was prolonging survival in patients with the bone marrow disorder myelofibrosis." The STAT News article characterized Defendant Scarlett's conduct a "bait-and-switch tactic" and stated the following:

. . . The Phase 2 study was designed primarily to determine if imetelstat could shrink spleens and improve myelofibrosis disease symptoms. *Geron and Janssen were keeping these data hidden, even though they were readily available. Shifting attention to survival was a smokescreen.*

On Thursday [September 27, 2018], we learned why. *The spleen response rate to imetelstat in the myelofibrosis study was a disappointing 10 percent*.

(Emphasis added.)

41.     As a result of these disclosures, the price of Geron's common stock declined from a closing price on September 26, 2018 of $6.23 per share, to close at $2.31 per share, a decrease of $3.92 per share, or over 62%, on massive trading volume of over 84 million shares.  The following day, Geron shares declined an additional $0.55 per share, or approximately 24%, on heavy volume of over 45 million shares traded, to close at $1.76 per share.  This decrease of over 71% in the price of Geron's securities was a result of the artificial inflation caused by Defendants' misleading statements coming out of the stock price.

42.     On September 27, 2018, PMLive, a website that offers news and analysis on the pharmaceutical industry, published an article titled "Geron poleaxed as Partner J&J abandons only pipeline drug; Shares dropped by two-third as questions raised on imetelstat's potential" that stated, in part, that "Imetelstat has been conspicuously absent from J&J's R&D presentations for some months, raising eyebrow about the state of the programme . . . it's now emerged that [IMbark's] study data wasn't an outright success".

43.     On October 7, 2018, an article published on SeekingAlpha[α], which provides financial market news and analysis, titled "Geron's Biggest Problem Still Lies Ahead" stated, in part, "[r]ecently, Geron announced Janssen's intention to discontinue its partnership in the development of Geron's lead asset, imetelstat.  In the same press release, *Geron released discouraging data for Myelofibrosis*". (Emphasis added)  The article further stated the following concerning the IMbark study data:

> Although Janssen cited the partnership discontinuation was simply 'the result of a strategic portfolio evaluation and prioritization of assets within their portfolio,' *it would be naive of us to think*

> ***Janssen still believes Imetelstat has great commercial prospects. Otherwise, it would not have discontinued the partnership*** . . .
>
> ***numbers this low suggests the drug is not active in treating this particular disease.*** Furthermore, the side effects associated with Imetelstat elicit a very unfavorable risk/reward profile for these patients.   Compare the matured data to what Geron in 2014 described as 'unprecedented remissions' from a single-site [the pilot study] . . .
>
> The efficacy described above and the safety issues typically associated with Imetelstat ***suggests this drug is not at all effective in the treatment of MF*** . . . .

(Emphasis added).

44.     Geron shares have not recovered in over two years since the end of the Class Period, closing at $1.83 per share on October 21, 2020.

## III.     JURISDICTION AND VENUE

45.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by SEC, 17 C.F.R. § 240.10b-5. Jurisdiction for this Court is conferred over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

46.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. In addition, Defendants reside and/or transact business in this District. The Company maintains its corporate headquarters in this District.

47.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## IV.     PARTIES

48.     Plaintiff purchased Geron common stock on the public market during the Class Period as described in the Certification attached hereto, and suffered damages as a result of the violations of the federal securities laws alleged herein.

1   49. Defendant Geron is a biopharmaceutical company that is incorporated in Delaware

2 and has its principal executive offices in Menlo Park, California. Geron's common stock is traded

3 under the symbol GERN on the NASDAQ, an efficient market. According to Geron's filings with

4 the SEC, as of March 7, 2018, there were 160,654,027 shares of the Company's common stock

5 outstanding, and as of October 25, 2018, there were 186,348,066 shares of the Company's common

6 stock outstanding.

7   50. Defendant Scarlett was the Company's President and CEO and a member of the

8 Company's board of directors throughout the Class Period.  He made materially false and

9 misleading statements and omitted material facts in Geron's SEC filings, press releases and on

10 public conference calls with analysts and investors, and at investor conferences during the Class

11 Period.  Defendant Scarlett, as a senior executive and director of Geron, acted within the scope of

12 his authority and as an agent of Geron during the Class Period

13   51. During the Class Period, Geron had only approximately 18 employees, and

14 Defendant Scarlett ran the Company as a hands-on manager overseeing Geron's operations.

15 Defendant Scarlett had intimate knowledge about core aspects of Geron's financial and business

16 operations, as imetelstat was the Company's only developmental drug candidate. He was also

17 intimately involved in deciding which disclosures would be made by Geron. Because of his position

18 and access to material non-public information available to him from Geron's representatives on the

19 JSC, Defendant Scarlett knew, or disregarded with at least deliberate recklessness, that the material,

20 adverse results of the IMbark study had not been disclosed to, and were being concealed from, the

21 public, and that the representations, which were being made, were materially false and misleading.

22 Defendant Scarlett, because of his position with Geron, possessed the power and authority to

23 control the contents of the Company's reports to the SEC, press releases, and presentations to

24 securities analysts, money and portfolio managers, and institutional and individual investors.  He

25 was provided with copies of the Company's reports and press releases alleged herein to be

26 misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent

27 their issuance or cause them to be corrected.

28

1

## V.    BACKGROUND

2        52.    Geron is a clinical stage biopharmaceutical company developing imetelstat to treat

3  cancers that affect the blood, bone marrow and lymph nodes, such as MF and myelodysplastic

4  syndromes ("MDS").  Imetelstat was Geron's sole product candidate.

5        **A.    Geron's Collaboration and License Agreement with Janssen**

6        53.    In or around 2014, imetelstat was in early-phase clinical development for treatment

7  of patients with MF and MDS.  According to Geron, results of an early clinical "Pilot Study"

8  indicated that imetelstat had a disease-modifying activity in MF, produced "unprecedented and

9  durable" complete and partial remissions, and provided evidence that imetelstat's mechanism of

10  action inhibited growth of cancer cells. In the pilot study, 39% of patients with enlarged spleens

11  achieved reduction in spleen size of ≥50%, and symptom responses of ≥50% were observed in 77%

12  of patients.  Furthermore, over 21% experienced a complete or partial remission, and another 18%

13  experienced clinical improvements, for a total of over 40% of patients experiencing a complete or

14  partial remission, or clinical improvement.  Half of patients had received prior treatment with Jakafi

15  or similar treatment.

16        54.    When a treatment completely eliminates cancerous cells that could be measured or

17  seen on a test, it is referred to as a complete response or complete remission.  A partial response or

18  partial remission means the cancer partly responded to treatment, often defined as at least a 50%

19  reduction in measurable cancerous cells.

20        55.    While Jakafi and similar treatments can alleviate constitutional symptoms and

21  reduce spleen size, they do not halt disease progression, as seen in the imetelstat pilot study.

22  Consequently, Defendant Scarlett described the pilot study results as "unprecedented" and

23  "durable".  Furthermore, Defendant Scarlett stated that, with respect to patients in the pilot study,

24  "a meaningful number of them actually cleared their bone marrow entirely or came very, very close

25  to clearing. And we call those complete remissions or partial remissions. And that was the first time

26  any drug had ever convincingly showed that. So that was the big news with myelofibrosis."

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

56.     On November 13, 2014, Geron and Janssen entered into the Collaboration and License Agreement.  Under the CLA, Janssen was granted the exclusive rights to develop and commercialize imetelstat worldwide for all indications in oncology, including MF.

57.     Geron received a $35 million upfront payment from Janssen, and, based on whether the CLA was extended, was eligible for up to $900 million for the achievement of certain development, regulatory and commercial milestones, as well as royalties on worldwide net sales.

58.     Under the CLA, development of imetelstat proceeded under a mutually agreed clinical development plan, which was expected to include Phase 2 studies in MF and MDS as initial studies, and additional registration studies in MF and MDS, and exploratory Phase 2 studies for treatment of related diseases.  Geron expected the initial Phase 2 study in MF to be initiated in mid-2015 (the IMbark study), followed later by a Phase 2/3 MDS study (called IMerge). Development costs for the MF and MDS studies would be shared between the companies on a 50/50 basis.

59.     The CLA provided that Janssen would make a decision whether to maintain its licensing rights under the CLA.  Janssen's decision to continue development of imetelstat would depend in material part on the IMbark study data.  If Janssen opted to continue licensing imetelstat, Geron would receive a milestone payment of at least $65 million.

**B.      The CLA's Joint Geron-Janssen Governance Committees**

60.     Under the CLA, certain regulatory and development activities would be managed through a joint governance structure, with Janssen responsible for operational implementation of these activities.  The CLA established the Joint Steering Committee and Joint Development Committee (the "Governance Committees"), which, pursuant to the CLA, was comprised of three senior Geron executives and three Janssen executives.

61.     Geron's representatives on the JSC included Behrs, Geron's Executive Vice President, Business Development and Portfolio & Alliance Management, and Grethlein, Geron's Executive Vice President, Development and Technical Operations.  Behrs' work on the Governance Committees was resolving issues encountered and assessment of data sets based on interim data reviews.  Similarly, Grethlein played a key leadership role as a member of the Governance

Committees, including evaluation of development and regulatory options for the imetelstat clinical programs, particularly in response to interim data reviews.

62.     For Janssen, Dr. Aleksandra Rizo ("Rizo") was a Senior Director, Compound Development Team Leader at Janssen for all Phase 1 myeloid assets, and Global Clinical Leader for all myeloid assets, including imetelstat. Rizo had oversight and leadership responsibilities for overall clinical development strategy, study designs, execution and data interpretation for all related programs. In addition, Rizo was a core member of Janssen's Hematology Strategy Team, and in this role, participated and led diligence projects in hematology.

63.     The JSC oversaw and monitored IMbark, and reviewed the results and progress, including periodic reviews of IMbark study data, clinical, regulatory and safety data, results, reports and analyses.  The JSC members met at least quarterly, and other participants in the JSC's work included members of working groups from Geron and Janssen.

64.     The meetings of the JSC were chaired by Janssen.  The chairperson set agendas for meetings in advance, and Geron and Janssen rotated the responsibility for preparing draft minutes of each meeting for review.  The chairperson issued final minutes signed or otherwise approved in writing (such as via an electronic signature) by a Janssen representative and a Geron representative.

65.     During a conference call on November 14, 2014 announcing the CLA, Defendant Scarlett said that Geron would play "an active role on the joint steering committee and other governance committees" and would participate "fully in the governance of the joint development and commercial efforts of the partnership over the life of the agreement."  Although Janssen would have operational responsibility, Defendant Scarlett stated that "very clearly we'll continue to be very much in the flow both of data and also decision-making."

66.     Similarly, on a conference call with analysts and investors on March 3, 2015, Defendant Scarlett stated:

> . . . we plan to continue to diligently represent Geron's interest on the imetelstat joint development committee and joint steering committee, as well as on several joint working groups, operating under the purview of the joint steering committee.

> Through these committees, our responsibilities [] include active review and approval of all clinical studies, manufacturing plans and budgets, and leading the filing, prosecution, and maintenance of the imetelstat global patent portfolio. For example, work with Janssen is ongoing on the protocol for the new Phase II MF trial [IMbark].

67. On May 9, 2017, Defendant Scarlett further explained Geron's role on the JSC:

> So maybe I can help first by saying what does that Joint Steering Committee actually do, and the answer is that, that is the decision-making body that when we talk about things that have been decided. . . . the Joint Steering Committee which consists of senior Janssen executives and senior Geron executives . . . look at all the data and say yes, we agree. They usually are looking at the work of other subcommittees. They have multiple subcommittees that, if you will, report up to the Joint Steering Committee. . . . So anytime you see that the Joint Steering Committee has decided, determined, affirmed, whatever the words are, that means that Janssen is fully participated in that, fully agrees.

**C.   IMbark Was a Phase 2 Clinical Study of Imetelstat for MF**

68. In or around April 24, 2015, Janssen and Geron initiated the IMbark study, a Phase 2 "Study to Evaluate Activity of 2 Dose Levels of Imetelstat in Participants With Intermediate-2 or High-Risk Myelofibrosis (MF) Previously Treated With Janus Kinase (JAK) Inhibitor". The IMbark study was designed to evaluate the activity of imetelstat in patients with high-risk MF who have relapsed after, or did not respond to other treatment for MF (refractory), and to evaluate the findings in the imetelstat pilot study.

69. In July 2015, IMbark opened to patient enrollment.

70. IMbark's co-primary efficacy endpoints objectively measured whether imetelstat improved patient quality of life and alleviated symptoms—whether spleen volume and other debilitating symptoms were reduced.  Spleen volume reduction is defined as the proportion of patients who achieve ≥ 35% reduction in spleen volume from baseline at the week 24 visit, which could be objectively measured by imaging scan.  Total symptom reduction is defined as the proportion of patients who have ≥ 50% reduction in total symptom scores from baseline at the week 24 visit, based on patient-reported severity of various symptoms associated with MF.

71. Defendants selected spleen volume reduction and reduction in symptoms as the two primary endpoints to measure the efficacy of imetelstat because they were used in connection with FDA approval of Jakafi.  At the time IMbark was initiated, Incyte Corporation's Jakafi (ruxolitinib),

was the only FDA-approved drug for adults with certain types of MF.  To gain FDA approval, Incyte studied spleen reduction and symptom reduction.  Other experimental studies on treatments for MF similarly used these endpoints.

72.    In the Phase 3 study data for Jakafi—which Defendant Scarlett stated were "impressive"—42% of patients achieved a greater than 35% reduction in spleen volume (compared to 1% of patients in control group taking a placebo), and achieved high levels of statistical significance for improvement in severe and debilitating symptoms.

73.    During a May 18, 2015 conference call with investors, Defendant Scarlett stated that "we're trying to go using a regulatory end point that's been used for approval of the previous product, the spleen and symptoms, but it's just as important to see how many patients in this study have CRs [complete remissions] and PRs [partial remissions] and the other elements of a deeper response . . . I can say we're confident that the reason that the drug has gained this much interest from many different people including those of us who are now developing it, was really because of that in-depth CR and PR response."

74.    Defendant Scarlett repeatedly stated that IMbark's co-primary endpoints of spleen volume reduction and total symptom score were key to establishing imetelstat's efficacy in treatment of patients suffering from MF.  During a conference call with analysts and investors on April 10, 2017, Defendant Scarlett stated that "we chose these endpoints because the only precedent for regulatory approval in MF was developed from previous trials in which ruxolitinib [(Jakafi)], a JAK inhibitor, was used to treat front-line MF patients."

75.    During an August 3, 2016 conference call with analysts and investors, Defendant Scarlett reiterated the importance of the co-primary end points selected for the IMbark study in response to an analyst's question:

> . . . the reason that we picked splenomegaly [abnormal enlargement of the spleen] -- spleen response rate and total symptom response rate was really because those are the approved endpoints so far for ruxolitinib [(Jakafi)]. And since these patients are all refractory or relapsed from JAK inhibitor therapy, that made a lot of sense. It is a regulatorily approved endpoint. . . .  I think that just makes sense from the precedent information that's available.

76.     IMbark's 14 secondary endpoints included complete remission or partial remission, and clinical improvement.  IMbark's fifth secondary endpoint was overall survival.  Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm and overall survival may be unreliable due to variability in patient selection and baseline patient conditions, and may overstate or understate treatment efficacy.

77.     On May 9, 2017, at the Company's annual shareholder meeting, Defendant Scarlett stated IMbark was "not designed to answer whether there was a quantitative overall survival benefit. To do that, we required . . . a control group."

**D.     The JSC Reviews IMbark Trial Data**

78.     For each of the JSC's reviews of IMbark data, Behrs played a key leadership role as a member of the Governance Committees to ensure active monitoring of progress versus key program goals, including the data reviews in October 2016, April 2017, and the March 2018 data review.   Similarly, Grethlein played a key leadership role as a member of the Governance Committees.

79.     Behrs and Grethlein reported the results of IMbark and JSC's observations of the IMbark trial data to Defendant Scarlett.

80.     On September 12, 2016, Defendant Scarlett conducted a conference call with analysts and investors during which he provided an update on IMbark based on an interim review of IMbark data.  While Defendant Scarlett declined to discuss specific data results, he described the data results as showing "encouraging trends in the efficacy data" that "were observed."   In response to an analyst question for details about the encouraging trends, Defendant Scarlett responded:

> . . . we're not talking about the specifics of any of these results in terms of, you know, various outcomes and so forth. We've always stated that we wouldn't be doing that, we'd just be talking about outcomes of the trial. So, I don't think I'm in a position to really make much more of a comment about that other than to say that obviously they were encouraging trends, you know, in progressing towards, you know, towards the assessment of the co-primary end points, [specifically] the symptoms reduction.

1

But beyond that, I don't think I would – I'm in a position to talk about that.

2

81.     In October 2016, the last patient was enrolled in IMbark.

3

82.     Because spleen volume reduction and total symptom scores were measured after

4

patients had been taking the drug for 24 weeks, and the last patient enrolled in IMbark in October

5

of 2016, objective data regarding the co-primary endpoints for patients enrolled in IMbark, were

6

available starting in or around April 2017.

7

83.     On April 10, 2017, during a conference call with analysts and investors, Defendant

8

Scarlett discussed the JSC's April 2017 internal review of IMbark data.  Defendant Scarlett stated

9

that the JSC observed that "spleen volume response rate observed to date was less than that reported

10

in front-line MF patients treated in trials with other drugs" but did not disclose any IMbark data or

11

the material, adverse data results.  Defendant Scarlett, instead, stated "activity within multiple

12

outcome measures was observed with imetelstat treatment, which suggests clinical benefit in this

13

relapsed or refractory MF population. These outcome measures included a range of spleen volume

14

reductions, decreases in total symptom scores and improvements in hematologic parameters such

15

as anemia and peripheral blood counts. In addition, the data suggests a potential overall survival

16

benefit associated with imetelstat treatment."

17

84.     After April 2017, additional safety and efficacy data from IMbark continued to be

18

generated from patients who continued treatment with imetelstat, while Janssen began evaluating

19

the IMbark study data.  Furthermore, in the following months, Janssen evaluated maturing efficacy

20

and safety data from the IMbark trial, including an assessment of any purported overall survival

21

benefit.

22

85.      In October 2017, in response to an FDA information request regarding the benefit-

23

risk profile of imetelstat in relapsed or refractory MF and justification for continued treatment of

24

patients enrolled in the IMbark study, Janssen submitted to the FDA data from the JSC's April 2017

25

data review, as well as additional efficacy and safety data, including information about deaths and

26

overall survival in IMbark.

27

86.     In March 2018, by the start of the Class Period, the JSC conducted a third review of

28

the IMbark data based on the data as of January 2018, over 64 weeks after the last patient enrolled

in IMbark. All of the patients in the IMbark study had taken imetelstat so the results were not "blinded," meaning that the JSC members could see overall spleen volume reduction and total symptom scores for patients who participated in IMbark.

87. Based on the March 2018 review, Behrs and Grethlein knew, or disregarded with at least deliberate recklessness, that the IMbark study produced material, adverse results, and reported this to Defendant Scarlett. The IMbark trial results indicated that imetelstat was not effective in treating MF and that it did not have a disease modifying effect. Indeed, 90% of patients failed to experience a spleen volume reduction of ≥35, and 68% had failed to experience a reduction in debilitating symptoms of ≥50%. Further, just one patient experienced a partial response and there were zero complete responses, for an overall response rate—the proportion of patients who had a partial or complete response to imetelstat—of just 1.7%, demonstrating that imetelstat did not have a disease modifying effect in sharp contrast to the results of the imetelstat pilot study.

88. The overall survival data was unreliable because there was no control group, and comparison of IMbark's data to overall survival data produced in unrelated studies was unreliable due to variability in patient selection and baseline patient health conditions.

89. By the start of the Class Period, Janssen determined it had acquired enough data and closed the IMbark trial.

90. Janssen was disappointed with the IMbark study data and did not agree that IMbark's overall survival data demonstrated imetelstat's clinical efficacy.

91. Defendants knew of, or disregarded with deliberate recklessness, red flags that indicated it was probable that Janssen would terminate its collaboration with Geron based on the results of the IMbark study data and Janssen's negative view of the IMbark study data. Namely, the actual IMbark study data showed that imetelstat failed to show signs of efficacy with respect to IMbark's co-primary endpoints, and overall survival data was essentially meaningless because IMbark had no control arm and comparisons to overall survival in unrelated studies were unreliable, and therefore, Janssen determined that the IMbark data did not show an adequate improvement in survival to support further development of imetelstat in MF patients by Janssen and it was probable that Janssen would not continue the CLA and make any milestone payments to Geron.

92.     The material, adverse results of IMbark based on the March 2018 review of the study data and Janssen's negative view of the IMbark study data were reflected in the draft and final minutes of the JSC.

93.     Behr and Grethlein, as members of the JSC and as senior executives and officers of Geron who acted within the scope of their authority and as agents of Geron during the Class Period, reported the JSC's March 2018 observations concerning the IMbark study data to Defendant Scarlett and Janssen's negative view of the IMbark study data.

94.     Defendants told investors that Janssen's decision whether to continue licensing imetelstat was expected by September 30, 2018.

**VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD**

95.     During the Class Period, Defendants' representations to investors were materially false and misleading at the time they were made, and Defendants failed to disclose material facts that they had a duty to disclose in order to make the statements made by Defendants, in light of the circumstances under which they were made, not misleading.

96.     Defendant Scarlett made false and misleading representations when he disclosed certain purportedly positive efficacy data about IMbark's median overall survival rate, one of 14 secondary, much less important endpoints in the IMbark study.  Even assuming, *arguendo*, that imetelstat showed an improvement in overall survival (which was dubious and misleading because there was no control group in IMbark), it was misleading for Defendants to selectively disclose purportedly positive data, without also disclosing the negative IMbark data—that 90% of patients did not experience a reduction in spleen size of $\geq 35\%$, and 68% of patients did not experience a reduction in symptoms of $\geq 50\%$, the two key primary endpoints and the most important clinical outcomes being studied in IMbark, and that imetelstat did not cause IMbark patients to achieve the complete and partial remissions as seen in the pilot study, and therefore imetelstat did not have a disease modifying effect.

97.     Furthermore, based on information reviewed and discussed at meetings of the JSC, Defendants knew of, or disregarded with deliberate recklessness, red flags that indicated Janssen

1    would probably terminate its collaboration with Geron based on the results of the IMbark study

2    data and Janssen's negative view of the IMbark study data.  Namely, the actual IMbark study data

3    showed that imetelstat failed to show signs of efficacy on IMbark's co-primary endpoints, overall

4    survival data was essentially meaningless because IMbark had no control arm, imetelstat did not

5    have a disease modifying effect, and therefore imetelstat provided no meaningful clinical benefit

6    to MF patients, especially light of imetelstat's safety risks, and the IMbark study data did not show

7    sufficient clinical benefit to support further development of imetelstat by Janssen.

8        98.    On March 16, 2018, after the market closed, Defendant Scarlett caused Geron to file

9    its annual report for the year ended December 31, 2017 with the SEC on Form 10-K ("2017 10-K").

10   Defendant Scarlett signed the 2017 10-K.  Defendants stated, in part, the following about the

11   IMbark study data:

12       Preliminary observations and Actions

13       Since IMbark was initiated, Janssen has conducted internal data
14       reviews in September 2016 and April 2017. Based on these
         reviews, the JSC made the following observations and
15       implemented the following actions: . . .

16       • The data supported 9.4 mg/kg as an appropriate starting dose in
         the trial. Activity within multiple outcome measures was observed
17       with imetelstat treatment, suggesting potential clinical benefit in
         MF patients who are relapsed or refractory to prior JAK inhibitor
18       treatment. **A range of spleen volume reductions were reported,**
         **as well as reductions in Total Symptom Score,** and
19       improvements in hematologic parameters, such as anemia and
         peripheral blood counts. **The spleen volume response rate**
20       **observed in the 9.4 mg/kg dosing arm was less than that**
         **reported in clinical trials with JAK inhibitors in front-line MF**
21       **patients** . . .

22       Current Status of IMbark

23       In March 2018, Janssen completed a third internal data review of
         IMbark, based on a January 2018 data cut, to enable a protocol
24       amendment to allow the long-term treatment and follow up of
         patients, including for survival, and the JSC made the following
25       observations and implemented the following actions: . . .

26       •    **Outcome measures for efficacy, including spleen volume**
              **response and reductions in Total Symptom Score**
27            **remain consistent with prior data reviews**.

28

1

• **With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm**.[2]

2

3        99.    Defendants' representation that with a "median follow-up of approximately

4   19 months, the overall survival has not been reached" indicated that the overall survival could be

5   longer than 19 months, an apparently positive result that imetelstat was effective in improving

6   overall survival, the fifth of IMbark's 14 secondary endpoints.  However, Defendant Scarlett misled

7   investors by failing to disclose the negative data indicating that imetelstat was not effective in

8   improving patient quality of life, as 90% of patients failed to experience a spleen volume reduction

9   of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%,

10  there were zero complete remissions and one partial remission indicating that imetelstat did not

11  have a disease modifying effect, in contrast to the imetelstat pilot study, and that IMbark's overall

12  survival data was essentially meaningless because there was no control group in the IMbark study.

13  When Defendant Scarlett announced intended positive information concerning overall survival

14  results from the IMbark study, he had a duty under the federal securities laws to disclose the

15  material, adverse information that cut against the positive information.  Defendant Scarlett's failure

16  to comply with his duties gave Geron investors an impression of a state of affairs that differed in a

17  material way from the one that actually existed because it was misleading for Defendants to

18  represent that imetelstat might be effective in increasing overall survival without disclosing that the

19  IMbark data showed that imetelstat was not effective in reducing spleen size and MF's debilitating

20  symptoms, and that patients' quality of life did not improve for the vast majority of patients, which

21  were the two primary endpoints and the most significant clinical outcomes IMbark studied, and that

22  imetelstat did not have a disease modifying effect as seen in the imetelstat pilot study.

23        100.    Moreover, it was false and misleading for Defendants to represent with respect to

24  the IMbark data that a "range of spleen volume reductions were reported, as well as reductions in

25  Total Symptom Score" and that the "[o]utcome measures for efficacy, including spleen volume

26

27  [2]  The statements quoted in this section in **underlined, bolded** text are materially false and
    misleading for the reasons set forth herein.  Additionally, as specifically indicated below, many of
    the identified statements are alleged to have been false and misleading by omission.  Thus,
28  additional text is provided for context and in support of these statements' allegedly omissive nature.

response and reductions in Total Symptom Score remain consistent with prior data reviews" without disclosing the actual IMbark study data.  The IMbark data showed imetelstat was not effective in improving quality of life because the vast majority of patients in the IMbark study had failed to meet the trial's co-primary endpoints at week 24.   90% of patients did not experience a reduction in spleen volume of ≥35%, and 68% did not experience a reduction in debilitating symptoms of ≥50%.  No patient experienced a complete remission, as was seen in the pilot study. IMbark showed that imetelstat did not produce the unprecedented and durable results seen in the imetelstat pilot study of MF patients treated with imetelstat.       Furthermore, Defendants' representation that "the spleen volume response rate observed in the 9.4 mg/kg dosing arm was less than that reported in clinical trials with JAK inhibitors in front-line MF patients" was false and misleading, and essentially meaningless, because IMbark was being studied on second-line patients.  Defendants failed to disclose that IMbark's study data results failed to match results in comparable Phase 2 studies of other second-line MF treatments.  For example, in another Phase 2 study of MF patients treated with pacritinib, a second-line MF therapy, 37% of patients achieved a reduction in spleen volume of ≥35%, and 48% achieved a reduction in debilitating symptoms of ≥50%.  Moreover, the IMbark study data failed to match outcomes in the imetelstat pilot study— where 39% of patients achieved a reduction in spleen volume of ≥35%, and 77% achieved a reduction in debilitating symptoms of ≥50% in a study where half the patients were second-line.

101.    The 2017 10-K contained generic warnings of future "risks and uncertainties that **may** have a material adverse effect" on Geron's business.   The 2017 10-K provided future risk warnings that:

- if imetelstat fails to meet criteria determined by Janssen to support an affirmative Continuation Decision, or for any other reason, Janssen **may** discontinue the imetelstat program and terminate the Collaboration Agreement [and] . . .

- Even if Janssen obtains longer-term efficacy and safety data for IMbark, Janssen . . . **may** determine that such data do not show an adequate improvement in survival to support further development and potential regulatory approval for imetelstat in relapsed or refractory MF patients, which we expect would result in a decision by Janssen to discontinue

IMbark and the imetelstat program and terminate the Collaboration Agreement" . . . .

102.   The risk warnings delineated above in paragraph 101 were materially false and misleading because at the time Defendants warned of these potential, future risks, the risks had already materialized.  Defendants knew, or disregarded with at least deliberate recklessness, that the IMbark study's data showed that imetelstat failed to meet the co-primary endpoints for the vast majority of patients and did not have a disease modifying effect, which were material factors to Janssen's decision whether to continue licensing imetelstat, that Janssen did not agree that IMbark's overall survival data were meaningful, given there was no control group and that comparisons to other unrelated studies were unreliable, that the IMbark data failed to meet Janssen's criteria for continued development of imetelstat, and Janssen determined that such data did not show an adequate improvement in survival to support further development of imetelstat by Janssen, and therefore it was probable that Janssen would terminate its partnership with Geron.

103.   The 2017 10-K contained the future risk warning that "[c]urrent clinical trials of imetelstat being conducted by Janssen, including IMbark . . . and the Pilot Study  . . . **may** fail to demonstrate sufficient safety and efficacy of imetelstat to warrant further development of the drug, which could prevent or further delay regulatory approval and commercialization of imetelstat."

104.   The risk warning delineated above in paragraph 103 was materially false and misleading because at the time Defendants warned of this potential, future risk, Defendants knew, or disregarded with at least deliberate recklessness, that the risk had already materialized.  The material, adverse results of the IMbark study that Defendants and Janssen had as of March 2018 showed that imetelstat was not effective in improving patient quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%.  Furthermore, the risk warning was materially false and misleading because at the time Defendants warned of this potential, future risk concerning the pilot study, Defendants knew, or disregarded with at least deliberate recklessness, that the potential disease-modifying activity observed in the pilot study had not been seen in the IMbark study as there were zero complete remissions and one partial remission, for an overall response rate of less than 2%, compared to over 21% in the pilot study.

105.    The 2017 10-K contained the future risk warning that "the potential disease-modifying activity observed through molecular responses in the ET trial and partial or complete remissions observed in the Pilot Study **may** not be seen in current or future clinical trials of imetelstat."

106.    The risk warning delineated above in paragraph 105 was materially false and misleading because at the time Defendants warned of this potential, future risk, this risk had already materialized.   Defendants knew, or disregarded with at least deliberate recklessness, that the potential disease-modifying activity observed in the pilot study had not been seen in the IMbark study as there were zero complete remissions and one partial remission.

107.    Also on March 16, 2018, after the market closed, Defendant Scarlett caused Geron to issue a press release, which was filed with the SEC on Form 8-K, disclosing the Company's financial results for the fourth quarter and year ended December 31, 2017, and recent events.   The press release repeated the following false representations that were made in the 2017 10-K:

> Janssen completed a third internal data review of IMbark in March 2018, based on a January 2018 data cut, to enable a protocol amendment to allow the long-term treatment and follow up of patients, including for survival, and the Collaboration's Joint Steering Committee (JSC) made the following observations and implemented the following actions: . . .
>
> - **Outcome measures for efficacy, including spleen volume responses and reductions in Total Symptom Score remain consistent with the prior data reviews.**
>
> - **With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm.**

108.    Defendants' representation that "[w]ith a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm" was materially false and misleading for the reasons delineated above in paragraph 99.

109.    Defendants' representation that "[o]utcome measures for efficacy, including spleen volume responses and reductions in Total Symptom Score remain consistent with the prior data reviews" was materially false and misleading for the reasons delineated above in paragraph 100.

110.    Before the market opened on Monday, March 19, 2018, the next trading day, Defendants held a conference call with investors and analysts to discuss the Company's fourth quarter and 2017 annual financial results. On that call, Defendant Scarlett falsely represented that the JSC's recent review of the clinical trial data showed median overall survival for all the patients had not yet been reached after a follow-up of 19 months, meaning the final, median overall survival might be longer, which Defendant Scarlett represented was an improvement to overall survival compared to "real world" patient survival:

> This morning, I'll start my remarks with a summary of the results from the latest internal data review conducted by Janssen on the IMbark and an update on the projected timing of the protocol-specified primary analysis for IMbark and the subsequent potential continuation decision from Janssen. . . . **with a median follow-up of approximately 19 months as of the January 2018 data cut, the median overall survival has not been reached in either dosing arm.**
>
> *   *   *
>
> The assessment of survival is important because we believe that a new treatment that could confirm improved survival would represent a meaningful clinical outcome for patients who are relapsed or refractory to the only approved MF treatment today. As experience with JAK inhibitors increases, both in the real world and clinical trial settings, we know that the majority of MF patients fail or stop JAK inhibitor treatment and data from recent literature and other sources suggest that the survival of these patients is limited.
>
> For example, **an analysis of real world data conducted by Janssen and presented at ASH in 2016 reviewed treatment patterns and outcomes of MF patients from 2 U.S. medical claims databases. This analysis suggested that once patients fail or discontinue ruxolitinib, mean overall survival is approximately 7 months. Three other recently published and independent papers describing outcomes of MF patients after discontinuing JAK inhibitor treatment, either in the context of a clinical trial or through commercial supply, estimated median overall survival of approximately 14, 15 or 16 months, respectively. Thus, imetelstat potentially could address a significant unmet medical need if its use is associated with survival that is meaningfully longer than 14 to 16 months.**

111.    Defendant Scarlett's representations that the IMbark data showed a potential improvement in overall survival compared to "real world data" were false and misleading because he failed to disclose the negative data indicating that imetelstat did not improve quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to

experience an improvement in severe, debilitating symptoms of ≥50%, and the IMbark data showed that imetelstat did not have a disease modifying effect. When Defendant Scarlett announced purportedly positive information concerning overall survival results from the IMbark study, he had a duty under the federal securities laws to disclose the material, adverse information that cut against the positive information. Defendant Scarlett's failure to comply with his duties gave Geron investors an impression of a state of affairs that differed in a material way from the one that actually existed because it was misleading for Defendants to represent data that imetelstat might be effective in increasing overall survival, a secondary, much less important endpoint with no control group, without disclosing that the IMbark data showed that imetelstat was not effective in reducing spleen size and MF's debilitating symptoms, which were the two primary endpoints and the most significant clinical outcomes. Furthermore, Defendant Scarlett's comparison of IMbark's purported overall survival benefit to other "real world data" was false and misleading because there was no control group in IMbark and comparison to other unrelated studies was unreliable and overstated imetelstat's overall survival benefit. As Defendants admitted after the Class Period, but did not warn Geron investors during the Class Period, comparative analyses between "real world data" and IMbark's study data had several material limitations, including that they failed to take into account certain patient characteristics that may affect the outcomes of the analyses, there could be bias in patient selection, and they could produce estimates that may not represent the outcomes for the treated patient population, all of which caused Defendant Scarlett's comparison of IMbark's overall survival data to "real world data" to be materially false and misleading.

112. As a result of Defendants' false representations, the price of Geron's common stock increased, from a closing price on March 16, 2018 of $3.37 per share, to close at $4.34 per share on March 19, 2018, the next trading day, an increase of $0.97 per share, or approximately 29%, on heavier than usual volume of more than 26 million shares traded. This increase was the result of artificial inflation caused by Defendants' misleading statements.

113. On March 27, 2018, after the close of trading, Defendant Scarlett made a presentation at the 17th Annual Needham Healthcare Conference in New York City. At the presentation, he introduced a slide entitled "IMbark Internal Data Reviews, Findings to Date." The

slide, which was also posted on Geron's website, purported to summarize "Internal data reviews completed by Janssen in September 2016, April 2017 and March 2018." Defendant Scarlett repeated the false representations that the IMbark data showed "Activity within multiple outcome measures observed, suggesting clinical benefit in R/R MF"; "Range of reductions in spleen volume"; "Decreases in Total Symptoms Score (TSS)"; "Spleen volume response (SVR) rate in 9.4 mg/kg arm was less than reported in clinical trials of JAK inhibitors in front-line MF patients," and "Median OS not reached in either dosing arm (with median follow-up of ~19 months at January 2018 data cut)."

114. Defendant Scarlett's representation that "Median OS not reached in either dosing arm (with median follow-up of ~19 months at January 2018 data cut)" was materially false and misleading for the reasons delineated above in paragraph 99.

115. Defendant Scarlett's representations that "Activity within multiple outcome measures observed, suggesting clinical benefit in R/R MF"; "Range of reductions in spleen volume"; "Decreases in Total Symptoms Score (TSS)"; "Spleen volume response (SVR) rate in 9.4 mg/kg arm was less than reported in clinical trials of JAK inhibitors in front-line MF patients," were materially false and misleading for the reasons delineated above in paragraph 100.

116. Recognizing that Janssen took a negative view of the IMbark study data and that it was probable that Janssen would terminate its collaboration agreement with Geron and avoid making a milestone payment of at least $65 million, Defendants began to sell millions of dollars in inflated Geron stock.

117. During the quarter ended March 31, 2018, Geron sold an aggregate of 776,788 shares of common stock, resulting in net cash proceeds of approximately $1,553,000 under a 2015 stock sale agreement with MLV & Co. LLC, under which Geron could elect to issue and sell shares of its common stock ("2015 Sales Agreement"). Before these sales, Defendant had not sold any stock under the 2015 Sales Agreement, or otherwise sold shares of Geron stock to investors since at least 2015.

118. In April 2018, Defendant Scarlett caused Geron to sell 12,418,318 shares of common stock through an at-the-market offering between $3.26 to $4.62 per share, resulting in net

cash proceeds to the Company of approximately $46,098,000 after deducting sales commissions and offering expenses payable by the Company.[3]  These sales completed the sale of the remaining common stock under the 2015 Sales Agreement.

119.    On May 10, 2018, Defendant Scarlett caused Geron to issue a press release that disclosed its financial results for the quarter ended March 31, 2018.  The May 10, 2018 press release represented the following:

> "As we have previously announced, we expect Janssen to make its decision about whether to continue their development of imetelstat by the end of third quarter of 2018," said John A. Scarlett, M.D., Geron's President and Chief Executive Officer. "Regardless of Janssen's future decision, we believe imetelstat warrants further development because of the activity observed in lower risk MDS patients from Part 1 of IMerge as presented at ASH last December, and **the evolving overall survival in relapsed or refractory MF patients observed in IMbark**."

120.    Defendant Scarlett's representation concerning IMbark's overall survival data was materially false and misleading.  While Defendants Scarlett asserted that imetelstat warranted further development because of a purportedly positive data concerning overall survival, when disclosing such purportedly positive data, he had a duty to disclose the material, adverse data of the IMbark study in order to make his representations not misleading.  Instead of disclosing that 90% of IMbark patients failed to experience a ≥35% reduction in spleen volume and 68% of patients failed to experience ≥50% reduction in debilitating symptoms, which were the two primary endpoints and the most significant clinical outcomes in the IMbark study, that there were no complete remissions as seen in the pilot study, and that Janssen did not agree that further development was warranted by Janssen based on unreliable overall survival data, Defendant Scarlett instead chose to misleadingly disclose the purportedly positive result that imetelstat improved overall survival, the fifth of IMbark's 14 secondary endpoints.  When Defendant Scarlett announced purportedly positive data concerning overall survival results from the IMbark study, he had a duty under the federal securities laws to disclose the material, adverse data results of the

---

[3] After disclosure of the true facts at the end of the Class Period, Geron shares declined to $1.76 per share, and Geron's stock price has never recovered in over two years since the end of the Class Period.

1    IMbark study that cut against the positive data.  Defendant Scarlett's failure to comply with his

2    duties gave Geron investors an impression of a state of affairs that differed in a material way from

3    the one that actually existed, in violation of the federal securities laws.  Even assuming, *arguendo*,

4    that the IMbark data, without a control group, showed an improvement in survival, it was

5    misleading for Defendants to represent that patients might see an increase in survival without

6    disclosing the material, adverse data that 90% of patients failed to experience a spleen volume

7    reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms

8    of ≥50%, and no patient experienced a complete remission, and that Janssen did not agree that

9    further development was warranted by Janssen based on unreliable overall survival data.

10        121.    On May 10, 2018, Defendant Scarlett caused Geron to file the Company's quarterly

11   report on Form 10-Q with the SEC ("Q1 2018 10-Q").  Defendant Scarlett signed a certification

12   pursuant to Section 302(A) of the Sarbanes-Oxley Act that certified he reviewed the Q1 2018 10-Q.

13        122.    The Management Discussion and Analysis ("MD&A") section of Q1 2018 10-Q

14   referred to overall survival as a "key" secondary endpoint and repeated representations concerning

15   the IMbark study data, including the purportedly positive representation concerning overall

16   survival:

> For IMbark, Janssen completed internal data reviews in September 2016, April 2017 and March 2018. . . **the JSC observed activity within multiple outcome measures with imetelstat treatment at the 9.4 mg/kg starting dose, suggesting potential clinical benefit in patients with MF who are relapsed after or refractory to prior treatment with a JAK inhibitor. However, the JSC observed that the spleen volume response rate in the 9.4 mg/kg dosing arm was less than that reported in clinical trials with JAK inhibitors in front-line MF patients**, . . . In March 2018, Janssen officially closed the trial to new patient enrollment. The JSC expects that the over 100 patients enrolled in IMbark to date will be adequate to assess overall survival. Patients who remain in the treatment phase of IMbark may continue to receive imetelstat, and until the protocol-specified primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to the extent possible, until death, to enable an assessment of overall survival. **The JSC concluded that as of January 2018, median follow up was approximately 19 months, and median overall survival had not been reached in either dosing arm.**

123.    Defendant Scarlett's representation that the "JSC concluded that as of January 2018, median follow up was approximately 19 months, and median overall survival had not been reached in either dosing arm" was materially false and misleading for the reasons delineated above in paragraph 99.

124.    Defendant Scarlett's representations that "Activity within multiple outcome measures observed, suggesting clinical benefit in R/R MF"; "Range of reductions in spleen volume"; "Decreases in Total Symptoms Score (TSS)"; "Spleen volume response (SVR) rate in 9.4 mg/kg arm was less than reported in clinical trials of JAK inhibitors in front-line MF patients," were materially false and misleading for the reasons delineated above in paragraph 100.

125.    The Q1 2018 10-Q incorporated by reference and repeated the risk factors warning of potential, future risk set forth in the 2017 10-K, alleged above in paragraphs 101, 103 and 105.

126.    Defendants purported risk warnings stated in the Q1 2018 10-Q were materially false and misleading for the reasons delineated above in paragraphs 102, 104, and 106.

127.    On May 15, 2018, Geron held the Company's 2018 annual shareholder meeting ("2018 Shareholder Meeting") and conducted a conference call with shareholders.  Defendant Scarlett, along with Geron executives Behr, Grethlein, Rosenfield, Geron's general counsel, and Geron director Spiegel participated in the 2018 Shareholder Meeting.  Rosenfeld and Spiegel later sold Geron stock in August and September 2018 when knowing that disclosure of Janssen's decision was imminent and weeks before Defendants disclosed the negative news, which caused Geron's stock price to collapse by more than 71%. During the 2018 Shareholder Meeting, Defendant Scarlett represented the following:

> In March of 2018, we announced that as of January of this year, **the median overall survival had not yet been reached in the trial** and we have not received any additional information about overall survival since then.

128.    Defendant Scarlett's representation that "the median overall survival had not yet been reached" in the IMbark study was materially false and misleading for the reasons delineated above in paragraph 99.

129.    On May 18, 2018, Geron entered into an At Market Issuance Sales Agreement (the "May 2018 Sales Agreement") with B. Riley FBR, Inc. ("B. Riley FBR"), pursuant to which the Company could issue and sell shares of its common stock having an aggregate offering price of up to $100 million of its stock from time to time through B. Riley FBR as its sales agent.  Also on May 18, 2018, Geron filed a prospectus supplement with the SEC on Form 424B5 for the sale of up to $100 million of its stock (the "May 18 Prospectus").

130.    The May 18 Prospectus incorporated by reference the 2017 10-K, which included the representations alleged above in paragraph 98 concerning the IMbark study data, including the purportedly positive overall survival data, which were materially false and misleading for the reasons delineated above in paragraphs 99-100.

131.    Furthermore, the May 18 Prospectus incorporated by reference the 2017 10-K's representations alleged above in paragraphs 101, 103 and 105 concerning future risk warnings, which were materially false and misleading for the reasons delineated above in paragraphs 102, 104 and 106.

132.    Furthermore, the May 18 Prospectus incorporated by reference the Q1 2018 10-Q, which included the representations alleged above in paragraph 122 concerning the IMbark data, including the purportedly positive overall survival data, which were materially false and misleading for the reasons delineated in paragraph 123-24.

133.    Furthermore, the May 18 Prospectus incorporated by referenced the Q1 2018 10-Q representations alleged above in paragraph 125 concerning future risk warnings, which were materially false and misleading for the reasons delineated in paragraph 102, 104, and 106.

134.    Between May 18 and June 30, 2018, Geron sold 9,447,026 shares of Geron common stock at inflated prices between $3.32 to $5.17 per share through B. Riley FBR, Inc. in an at-the-market offering for $36,208,000 in net proceeds under the May 18 Prospectus and May 2018 Sales Agreement.

135.    On July 10, 2018, Defendant Scarlett caused Geron to file an amended Registration Statement on form S-3/A with the SEC that was signed by Defendant Scarlett ("July 10 Registration Statement").

136.    The July 10 Registration Statement incorporated by reference the 2017 10-K, which included the representations alleged above in paragraph 98 concerning the IMbark study data, including the purportedly positive overall survival data, which were materially false and misleading for the reasons delineated above in paragraphs 99-100.

137.    Furthermore, the July 10 Registration Statement incorporated by reference the 2017 10-K's representations alleged above in paragraphs 101, 103 and 105 concerning future risk warnings, which were materially false and misleading for the reasons delineated above in paragraphs 102, 104 and 106.

138.    Furthermore, the July 10 Registration Statement incorporated by reference the Q1 2018 10-Q, which included the representations alleged above in paragraph 122 concerning the IMbark data, including the purportedly positive overall survival data, which were materially false and misleading for the reasons delineated in paragraphs 123-24.

139.    Furthermore, the July 10 Registration Statement incorporated by referenced the Q1 2018 10-Q representations alleged above in paragraphs 125 concerning future risk warnings, which were materially false and misleading for the reasons delineated in paragraphs 102, 104 and 106.

140.    On July 12, 2018, Defendant Scarlett caused Geron to file a prospectus on Form 424B5 with the SEC ("July 2018 Prospectus").  According to the July 12 Prospectus, "[a]s of the date of this prospectus, shares of our common stock having an aggregate offering price of up to $62,821,700 remained unsold under the [May 2018 Sales Agreement and May 18 Prospectus]. The common stock remaining available to be sold under the prior prospectus as of the date of this prospectus will no longer be offered and sold under the prior prospectus, but will instead be offered and sold under [the July 2018 Prospectus]. Accordingly, we may offer and sell shares of our common stock having an aggregate offering price of up to $62,821,700 pursuant to this prospectus."

141.    On July 31, 2018, Defendant Scarlett caused Geron to issue a press release that disclosed its financial results for the quarter ended June 30, 2018.  Also on July 31, 2018, Defendant Scarlett conducted a conference call with analysts and investors during which he made the following representations:

For IMbark, we expect Janssen to focus on projected median overall survival because patients eligible for IMbark has few other treatment options. **Since IMbark does not have a control arm, the assessment of overall survival can only be contextualized by looking at overall survival from other trials with similar MF patient populations, who have failed or been refractory to JAK inhibitor treatment. Janssen will make their own assessment whether they believe there is an adequate improvement in overall survival to warrant further development of imetelstat in relapsed refractory MF.**

\* \* \*

. . . From our perspective, **we believe the imetelstat program has been derisked by the collaboration with Janssen as they have evaluated the drug in Phase II for both MDS and MF, which is when much of the derisking of clinical development is done.**

142.   Defendant Scarlett's representation that the imetelstat program had been "derisked" by Geron's collaboration with Janssen was materially false and misleading because the data from the IMbark study concerning the two primary endpoints showed imetelstat was not effective in improving patient quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%, which were the two primary endpoints and the most significant clinical outcomes, and that Janssen did not agree that IMbark's purportedly positive overall survival data warranted further development of imetelstat by Janssen. The material, adverse results and Janssen's view of them were a material, undisclosed risk to the imetelstat program that weighed against Janssen opting to continue its collaboration with Geron, and increased the risk to the imetelstat program under the CLA.  While Defendant Scarlett asserted that the imetelstat program was "derisked" as a result of the purportedly positive overall survival data, he had a duty under the federal securities laws to disclose the material, adverse facts about IMbark's failure that cut against the positive data and that increased the risk to the imetelstat program.  Defendant Scarlett's failure to comply with his duties gave Geron investors an impression of a state of affairs that differed in a material way from the one that actually existed.

143.   Furthermore, Defendant Scarlett's representation that, "[s]ince IMbark does not have a control arm, the assessment of overall survival can only be contextualized by looking at overall survival from other trials with similar MF patient populations, who have failed or been

1   refractory to JAK inhibitor treatment" was materially false and misleading because Defendant

2   Scarlett's comparison of IMbark's purportedly positive overall survival to other, unrelated trials

3   was misleading.  As Defendants admitted after the Class Period, but did not warn Geron investors

4   during the Class Period, comparative analyses between "real world data" and IMbark's study data

5   had several material limitations, including that they failed to take into account certain patient

6   characteristics that may affect the outcomes of the analyses, there could be bias in patient selection,

7   and they could produce estimates that may not represent the outcomes for the true treated patient

8   population, all of which caused Defendant Scarlett's comparison of IMbark's overall survival data

9   to "real world data" to be materially false and misleading.

10         144.   Moreover, Defendant Scarlett's representation "Janssen will make their own

11   assessment whether they believe there is an adequate improvement in overall survival to warrant

12   further development of imetelstat in relapsed refractory MF" was materially false and misleading

13   because Defendants failed to disclose red flags that indicated that it was probable that Janssen

14   would terminate its collaboration with Geron based on the results of the IMbark study data and

15   Janssen's negative view of the IMbark study data.  Namely, the actual IMbark study data showed

16   that imetelstat failed to show signs of efficacy on IMbark's co-primary endpoints, overall survival

17   data was essentially meaningless because IMbark had no control arm, imetelstat did not have a

18   disease modifying effect as seen in the pilot study, and therefore imetelstat provided no meaningful

19   clinical benefit to MF patients, especially in light of imetelstat's safety risks, and the IMbark study

20   data did not show sufficient clinical benefit to support further development of imetelstat by Janssen.

21         145.   On July 31, 2018, Defendant Scarlett caused Geron to file the Company's quarterly

22   report on Form 10-Q with the SEC ("Q2 2018 10-Q").  Defendant Scarlett signed a certification

23   pursuant to Section 302(A) of the Sarbanes-Oxley Act that certified he reviewed the Q2 2018 10-Q.

24         146.   The MD&A section of Q2 2018 10-Q repeated the representations in the Q1 2018

25   10-Q alleged concerning the IMbark study data, including the purportedly positive overall survival

26   data alleged above in paragraph 122.

27         147.   Defendants' representations were materially false and misleading for the reasons

28   delineated above in paragraphs 123-24.

148.   The Q2 2018 10-Q incorporated by reference and repeated the risk factors warning of potential, future risks set forth in the 2017 10-K alleged in paragraphs 101, 103 and 105.

149.   Defendants purported risk warnings in the Q2 2018 10Q were materially false and misleading for the reasons delineated above in paragraphs 102, 104 and 106.

150.   Under the July 2018 Prospectus and May 2018 Sales Agreement, in July 2018 Geron sold 636,053 shares of Geron common stock at artificially inflated prices between $3.13 to $3.94 per share for proceeds of $2,167,000.

151.   On August 24, 2018, just weeks before the end of the Class Period, Rosenfield, exercised 1,362,250 options to purchase Geron shares at prices between $1.41 and $2.45 per share, and sold 100% of the shares he acquired at $4.51 per share for gross proceeds of over $6.1 million, and net proceeds of over $4.3 million.  These transactions represented the sale of approximately 74% of his Geron holdings, including vested options.  Rosenfield's sales were suspicious in timing and amounts.  As Executive Vice President, General Counsel and Secretary of a company with 18 employees and one drug candidate, he was in a position to know, or at least disregard with deliberate recklessness, that Defendants had been misleading investors about the material, adverse IMbark study results, Janssen's negative view of them, and that Defendants had been misrepresenting the risks attendant to the imetelstat program.  Before the Class Period, he had never in his six years as general counsel sold Geron shares on the open market, and he did not purchase any shares on the open market during the Class Period.  Moreover, he suspiciously entered into a trading plan on July 13, 2018, during the Class Period, and at a time that internally the Defendants and he were aware of the material, adverse results of the IMbark study and red flags indicating Janssen's negative view of the IMbark study data, that disclosure of Janssen's decision was imminent, and that it was probable that Janssen would not continue its partnership with Geron.

152.   On September 13, 2018, just days before the September 27, 2018 end of the Class Period corrective disclosure, Geron director Spiegel exercised 175,000 options to purchase Geron shares at prices between $1.10 and $5.29 per share, and sold 100% of the shares he acquired (or approximately 54% of his total Geron holdings including options) at $6.85 per share for gross proceeds of $1,198,750, and net proceeds of approximately $404,091.  Spiegel's sales were

suspicious in timing and amounts.  As a director of Geron with extensive experience developing oncology products, he was in a position to know, or at least disregard with deliberate recklessness, that Defendants had been misleading investors about the IMbark study results, Janssen's negative view of them, and that Defendants had been misrepresenting the risks attendant to the imetelstat program and that it was probable that Janssen would not continue its partnership with Geron. Before the Class Period, he had never sold Geron shares on the open market in his eight years as a Geron director, and he did not purchase any shares on the open market during the Class Period. Moreover, he suspiciously entered into a trading plan on July 18, 2018, during the Class Period, and at a time that internally Defendants and he were aware of the material, adverse results of the IMbark study and red flags indicating Janssen's negative view of the IMbark study data, that disclosure of Janssen's decision was imminent, and that it was probable that Janssen would not continue its partnership with Geron.

## VII.    THE TRUTH BEGINS TO EMERGE

153.    On September 27, 2018, before the market opened, Defendants disclosed the material, adverse results of the IMbark study when Defendant Scarlett caused Geron to issue a press release that stated in relevant part:

**IMbark Protocol-Specified Primary Analysis Highlights**

IMbark was designed as a Phase 2 clinical trial to evaluate two starting dose levels of imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered by intravenous infusion every three weeks) in approximately 200 patients with Intermediate-2 or High-risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor.

The co-primary efficacy endpoints for the trial are spleen response rate, defined as the proportion of patients who achieve a $\geq 35\%$ reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a $\geq 50\%$ reduction in Total Symptom Score, at 24 weeks. Key secondary endpoints are safety and overall survival.

***For the 9.4 mg/kg dosing arm (n=59), highlights from the primary analysis included a spleen response rate of 10% and a symptom response rate of 32%. No patients achieved complete remission, and one patient achieved partial remission.*** The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were

1
2

identified. The most common adverse events were cytopenias. At the time of the primary analysis, median overall survival had not been reached after 23 months of median follow-up.

3

(Emphasis added).

4

154.    Defendants also announced that Janssen had terminated its partnership with Geron

5

for the development of imetelstat.

6

155.    The same day the full results were finally disclosed, an article on STAT News

7

concerning Geron's disclosure stated in relevant part: "Back in March, Geron CEO John Scarlett

8

ignited a steep run higher in the stock price with a suggestion, uttered on a conference call, that

9

imetelstat was prolonging survival in patients with the bone marrow disorder myelofibrosis." The

10

STAT News article characterized Defendant Scarlett's conduct a "bait-and-switch tactic" and stated

11

the following:

12
13
14

. . . The Phase 2 study was designed primarily to determine if imetelstat could shrink spleens and improve myelofibrosis disease symptoms. **Geron and Janssen were keeping these data hidden, even though they were readily available. Shifting attention to survival was a smokescreen.**

15
16

On Thursday [September 27, 2018], we learned why. **The spleen response rate to imetelstat in the myelofibrosis study was a disappointing 10 percent.**

17

(Emphasis added.)

18

156.    As a result of these disclosures, the price of Geron's common stock dropped from a

19

closing price on September 26, 2018 of $6.23 per share, to $2.31 per share, a decrease of $3.92 per

20

share or over 62%, on massive trading volume of over 84 million shares.  The following day, Geron

21

shares declined an additional $0.55 per share, or approximately 24%, on heavy volume of over

22

45 million shares traded.  This decrease in the price of Geron's securities of over 71% was a result

23

of the artificial inflation caused by Defendants' misleading statements coming out of the stock

24

price.

25

157.    On September 27, 2018, PMLive, a website that offers news and analysis on the

26

pharmaceutical industry, published an article titled "Geron poleaxed as Partner J&J abandons only

27

pipeline drug; Shares dropped by two-third as questions raised on imetelstat's potential" that stated,

28

in part, that "Imetelstat has been conspicuously absent from J&J's R&D presentations for some

months, raising eyebrow about the state of the programme . . . it's now emerged that [IMbark's] study data wasn't an outright success".

158.    On October 7, 2018, an article published on investor website SeekingAlpha[a] titled "Geron's Biggest Problem Still Lies Ahead" stated, in part, "[r]ecently, Geron announced Janssen's intention to discontinue its partnership in the development of Geron's lead asset, imetelstat.  In the same press release, Geron released discouraging data for Myelofibrosis".

## VIII.   LOSS CAUSATION

159.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Geron common stock and operated as a fraud or deceit on purchasers of Geron common stock. As detailed above, when the truth about Geron's misconduct was revealed, the value of the Company's stock declined precipitously as the prior artificial inflation no longer inflated the stock's prices. The decline in the price of Geron shares was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members, was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of the Company's stock and the subsequent significant decline in the value of the Company's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

160.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the results of the IMbark study data, including purportedly positive overall survival data, the risks attendant to the imetelstat program, and that it was probable that Janssen would not continue its partnership with Geron, as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts

necessary to make Defendants' statements not false or misleading, causing the prices of Geron's common stock to be artificially inflated. Plaintiff and other Class members purchased Geron stock at those artificially inflated prices, causing them to suffer damages.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

161.   During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in deliberately reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Geron common stock during the Class Period.

162.   During the Class Period, Defendant Scarlett's misleading representations to investors caused Geron shares to trade at artificially inflated price, and knowing that Janssen would no longer fund the development of imetelstat, Defendants took steps to continue to inflate Geron's stock price and took full advantage of Geron's inflated stock price by selling more than $84 million of its common stock at an inflated price in at-the-market offerings during the Class Period. Moreover, on August 24, 2018, just weeks before the end of the Class Period, Rosenfield, Geron's Executive Vice President, General Counsel and Corporate Secretary, exercised 1,362,250 options to purchase Geron shares and sold 100% of the shares he acquired for gross proceeds of over $6.1 million (representing a sale of approximately 74% of his Geron holdings including options), and on September 13, 2018, just days before the September 27, 2018 end of the Class Period, Spiegel, a Geron director, exercised Geron options and sold all of the shares he acquired for over $1.1 million in Geron stock, a sales of approximately 54% of his Geron holdings including options. These sales were unusual and suspiciously timed.  Rosenfield's and Spiegel's sales were weeks before the end of the Class Period, at a time they knew that Janssen's decision whether to continue licensing imetelstat was imminent, and when Defendants and the selling-insiders knew (1) that the IMbark study data was materially adverse; and (2) it was probable that Janssen would not continue its partnership with Geron and would not continue to fund the development of imetelstat.  Further,

as alleged above, Rosenfield's and Spiegel's suspiciously timed sales allowed them to wrongfully avoid massive losses on their holdings of Geron shares.

## X.    NO SAFE HARBOR

163.    Geron's Safe Harbor" warnings accompanying any forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

164.    Defendants are liable for any false or misleading FLS pleaded herein because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Geron who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

165.    In addition, the FLS were contradicted by existing, undisclosed material negative facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

166.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    Geron's common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(e)     Plaintiff and other members of the Class purchased Geron common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

167.   At all relevant times, the market for Geron common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Geron filed periodic public reports with the SEC;

(b)     Defendants regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and investors, and other similar reporting services;

(c)     The Company was covered by research analysts, including Piper Jaffray, B. Riley FBR, BTIG, Cantor Fitzgerald, H.C. Wainwright, Needham & Co.; and

(d)     Geron was eligible to file a Form S-3 Registration Statement under the Securities Act of 1933 with the SEC, and, in fact, filed a Registration Statement on Form S-3 on May 24, 2018.

168.   Plaintiff and the Class' claims are also grounded on Defendants' failure to disclose material adverse information concerning the IMbark study data, and the risks attendant to the imetelstat program, facts Defendants had a duty to disclose in order to make the statements made by Defendants, in light of the circumstances under which they were made, not misleading.  Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  The withheld facts were material in the sense that a reasonable investor may have considered them important in making investment decisions.

1

## XII.   CLASS ACTION ALLEGATIONS

2   169.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

3   of Civil Procedure on behalf of all persons who purchased the common stock of Geron during the

4   Class Period (the "Class"). Excluded from the Class are Defendants, directors and officers of

5   Geron, and their families and affiliates. The members of the Class are so numerous that joinder of

6   all members is impracticable.

7   170.   The disposition of Plaintiff's and the Class' claims in a class action will provide

8   substantial benefits to the parties and the Court. Geron had more than 182 million shares

9   outstanding, owned by approximately 574 shareholders of record, excluding beneficial holders,

10   whose shares are held of record by banks, brokers and other financial institutions.

11   171.   There is a well-defined community of interest in the questions of law and fact

12   involved in this case. Questions of law and fact common to the members of the Class which

13   predominate over questions which may affect individual Class members include:

14   (a)   Whether the Exchange Act was violated by Defendants;

15   (b)   Whether Defendants omitted and/or misrepresented material facts;

16   (c)   Whether Defendants' statements omitted material facts necessary in order
17   to make the statements made, in light of the circumstances under which they
18   were made, not misleading;

19   (d)   Whether Defendants knew, or disregarded with at least deliberate
20   recklessness, that their statements were false and misleading at the time they
21   were made;

22   (e)   Whether the prices of Geron common stock were artificially inflated; and

23   (f)   The extent of damage sustained by Class members and the appropriate
24   measure of damages.

25   172.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

26   sustained damages from Defendants' wrongful conduct.

27

28

173.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

174.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**XIII.   CAUSES OF ACTION**

**COUNT I**

**For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

175.     Plaintiff incorporates paragraphs 1-174, by reference, as if fully set forth in Count I.

176.     During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew, or disregarded with at least deliberate recklessness, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

177.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

   (a)     Employed devices, schemes, and artifices to defraud;

   (b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Geron common stock during the Class Period.

178.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Geron common stock. Plaintiff and the Class would not have purchased Geron common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

179.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Geron common stock during the Class Period.

## COUNT II

### For Violation of § 20(a) of the Exchange Act Against Defendant Scarlett

180.   Plaintiff incorporates paragraphs 1-174, by reference, as if fully set forth in Count II.

181.   As set forth above, Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

182.   Defendant Scarlett acted as a controlling person of Geron within the meaning of Section 20 of the Exchange Act. By virtue of his position as the Company's President, CEO and a director, and his power to control public statements to investors about Geron, which he exercised throughout the Class Period, Defendant Scarlett had the power and ability to control the actions of Geron and its employees. By virtue of his position and power, Defendant Scarlett is liable pursuant to Section 20(a) of the Exchange Act.

183.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Geron common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23, certifying Plaintiff as class representative, and appointing Plaintiff's counsel as class counsel;

B.   Awarding Plaintiff and the members of the Class damages and interest;

C.   Awarding Plaintiff reasonable costs, including attorneys' fees; and

D.   Awarding such equitable injunctive or other relief as the Court may deem just and proper.

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

4

Respectfully submitted,

5

DATED:  October 22, 2020    **KAPLAN FOX & KILSHEIMER LLP**

6

By: /s/  *Laurence D. King*
                Laurence D. King

7

Laurence D. King (SBN 206423)

8

Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560

9

Oakland, CA  94612
Telephone: 415-772-4700

10

Facsimile: 415-772-4707
*lking@kaplanfox.com*

11

*mchoi@kaplanfox.com*

12

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (*pro hac vice* to be filed)

13

Jeffrey P. Campisi (*pro hac vice* to be filed)
850 Third Avenue

14

New York, NY 10022
Telephone:  212-687-1980

15

Facsimile:  212-687-771
*rkaplan@kaplanfox.com*

16

*jcampisi@kaplanfox.com*

17

*Lead Counsel for Lead Plaintiff and the Proposed Class*

18

19

20

21

22

23

24

25

26

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## <u>CERTIFICATION</u>

We, Julia Junge and Richard Junge, hereby certify and swear as follows:

1.  We have reviewed the amended consolidated complaint against Geron Corporation and John A. Scarlett alleging violations of the securities laws and authorize its filing;

2.  We are willing to serve as a representative party on behalf of a class, or to be members of a group representing a class, including providing testimony at deposition and trial, if necessary;

3.  We have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, other than this action;

4.  Our transactions in Geron's common stock during the proposed class period are set forth in Schedule A.

5.  We did not purchase Geron's common stock at the direction of our counsel or in order to participate in any private action under the federal securities laws; and

6.  We will not accept any payment for serving as a representative party on behalf of a class beyond our pro rata share of any recovery, except as ordered or approved by the Court.

We declare under penalty of perjury that the foregoing is true and correct.

Date: October ___, 2020
10/20/2020

_____
RICHARD JUNGE

Date: October ___, 2020
10/20/2020

_____
JULIA JUNGE

**Schedule A**

**Julia and Richard Junge's Transactions in Geron Corp Common Stock**

| Security Name | CUSIP | Transaction | Trade Date | Shares | Price |
|---|---|---|---|---|---|
| **Account 1:** | | | | | |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 2,000 | $6.36 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 200 | $6.35 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 100 | $6.36 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 300 | $6.35 |
| GERON CORP | 374163103 | Buy | 4/6/2018 | 35 | $3.53 |
| GERON CORP | 374163103 | Buy | 5/24/2018 | 4,350 | $4.88 |
| GERON CORP | 374163103 | Buy | 5/29/2018 | 100 | $4.79 |
| GERON CORP | 374163103 | Buy | 6/4/2018 | 35 | $3.91 |
| GERON CORP | 374163103 | Buy | 6/4/2018 | 1,050 | $3.78 |
| GERON CORP | 374163103 | Buy | 6/13/2018 | 2,700 | $3.77 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 35 | $3.42 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 300 | $3.42 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 395 | $3.42 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 14,365 | $3.42 |
| GERON CORP | 374163103 | Buy | 8/30/2018 | 12 | $5.48 |
| GERON CORP | 374163103 | Buy | 9/11/2018 | 255 | $6.34 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 1,003 | $5.52 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 3,800 | $5.51 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 100 | $5.51 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 800 | $5.51 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 300 | $5.51 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 2,891 | $5.50 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 38,606 | $5.52 |
| | | | | | |
| **Account 2:** | | | | | |
| GERON CORP | 374163103 | Buy | 3/23/2018 | 1,750 | $5.84 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 3,500 | $6.28 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 4,000 | $6.25 |
| GERON CORP | 374163103 | Buy | 3/28/2018 | 1,000 | $4.52 |
| GERON CORP | 374163103 | Buy | 4/3/2018 | 425 | $4.00 |
| GERON CORP | 374163103 | Buy | 4/6/2018 | 35 | $3.52 |
| GERON CORP | 374163103 | Buy | 4/26/2018 | 16,700 | $4.03 |
| GERON CORP | 374163103 | Buy | 4/26/2018 | 800 | $4.03 |
| GERON CORP | 374163103 | Buy | 4/26/2018 | 200 | $4.03 |
| GERON CORP | 374163103 | Buy | 4/26/2018 | 1,500 | $4.03 |

| GERON CORP | 374163103 | Buy | 5/7/2018 | 390 | $3.85 |
|---|---|---|---|---|---|
| GERON CORP | 374163103 | Buy | 6/4/2018 | 185 | $3.89 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 519 | $3.43 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 5,200 | $5.23 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 5,200 | $5.22 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 200 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 100 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 100 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 200 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 900 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 200 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 1,000 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 100 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 600 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 3,500 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 3,300 | $5.53 |
| GERON CORP | 374163103 | Buy | 9/5/2018 | 220 | $5.75 |
|  |  |  |  |  |  |
| **Account 3:** |  |  |  |  |  |
| GERON CORP | 374163103 | Buy | 9/5/2018 | 98 | $5.99 |
|  |  |  |  |  |  |
| **Account 4:** |  |  |  |  |  |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 300 | $6.42 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 2,300 | $6.21 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 200 | $6.21 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 2,400 | $6.20 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 1,400 | $6.19 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 3,700 | $6.18 |
| GERON CORP | 374163103 | Buy | 4/6/2018 | 75 | $3.53 |
| GERON CORP | 374163103 | Buy | 5/21/2018 | 4,580 | $3.57 |
| GERON CORP | 374163103 | Buy | 7/5/2018 | 2,080 | $3.87 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 200 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 600 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 600 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 107 | $3.42 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 200 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 600 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 100 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 200 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 800 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 100 | $3.41 |

| GERON CORP | 374163103 | Buy | 8/29/2018 | 340 | $5.39 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 1,800 | $5.53 |